**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| JEFFREY PLOTNICK, on behalf of himself, individually, and on behalf of all others similarly situated, ) ) ) | |
| ) | Civil Action No. _____ |
| Plaintiff, ) | Electronically Filed |
| ) | |
| vs. ) | **CLASS ACTION COMPLAINT** |
| COMPUTER SCIENCES ) CORPORATION DEFERRED ) COMPENSATION PLAN FOR ) KEY EXECUTIVES, and ) COMPUTER SCIENCES ) CORPORATION, ) ) | |
| Defendant. ) | |

Plaintiff Jeffrey Plotnick, by and through his counsel, on behalf of himself and all others similarly situated, alleges as follows:

## NATURE OF THE ACTION

1.       This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by Plaintiff on behalf of a Class of participants in the Computer Sciences Corporation Deferred Compensation Plan for Key Executives (the "CSC Plan") who retired from employment with CSC before January 1, 2013, to establish their right to benefits under the CSC Plan as it existed as of their retirement.

2.     The CSC Plan for Key Executives purports to be an unfunded plan for a select group of management or highly compensated employees, such as Plaintiff, that allows those employees to elect to defer a portion of their compensation until a specified period of time during their retirement.  Subject to certain specified limited exceptions permitted under the Internal Revenue Code, the deferral election becomes irrevocable before retirement.

3.     The CSC Plan enables CSC to attract and retain highly qualified employees as there is significant demand and competition for skilled employees in CSC's industry.  By allowing employees to defer income until retirement, the CSC Plan not only allows participants to save for retirement, but provides participants with potential tax benefits (or at least deferral of taxes) by receiving their compensation after their retirement.

4.     As the CSC Plan is an unfunded plan, the deferred compensation is not held in trust or otherwise segregated from CSC's general assets.  Instead the employees' deferred compensation is simply retained by CSC in exchange for the promise to pay the money after the participant retires.  To keep track of the amount of the deferrals, the CSC Plan participants' deferrals are credited to notional accounts. In addition to the amount actually deferred, the CSC Plan also provided prior to 2013 that the participants would be credited with a designated amount of earnings set forth in the terms of the Plan.

5. By 2012, CSC was experiencing stagnating revenues, negative cash flows, ratings downgrades, and declining shareholder returns. During 2012, CSC decided to change the terms of the CSC Plan in a manner that would reduce or at least delay payment of benefits to the plan participants, thereby reducing CSC's payment obligations under the Plan. Effective January 1, 2013, CSC amended the terms of the CSC Plan in at least the following ways: (1) to change the manner by which earnings were credited to participant accounts; (2) to provide —for the first time—that losses may be charged against participants' notional accounts, including after retirement; (3) to give CSC discretion to choose the periods in which earnings (or losses) will be credited (or charged); and (4) to change the rate of payments from what participants elected. This amendment was applied not only to future deferrals, but also on employees who had retired *prior to* the effective date of the amendment or even before the Amendment was announced.

6. The effect of the January 1, 2013 Amendment not only changed the consistency and stability of the participants' retirement income under the Plan, but also dramatically decreased the amount of immediate distributions paid under the Plan. By this action, Plaintiff seeks a determination that Defendants were not permitted to change the terms of the Plan after employees had retired and after they completed their service without obtaining the consent of the members of the Class.

Accordingly, Plaintiff seeks to enforce the terms of the Plan in existence as of his retirement and that of the Class.

## JURISDICTION AND VENUE

7.     **Subject Matter Jurisdiction**.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a) & (e), 29 U.S.C. § 1132(a) & (e).

8.     **Personal Jurisdiction**.  This Court has personal jurisdiction over Defendant because Defendant transacts business in, and has significant contacts with, this District, and because ERISA provides for nationwide service of process. *See* ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

9.     **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), for at least the following reasons:

(a)     Defendant may be found in this District, as it transacts business in, and/or has significant contacts with this District, and because its participants earned and/or earn some or all of their pension credits and receive(d) their pension payments in this District; and/or

(b)     The alleged breaches took place in this District because Plaintiff and some other class members who were or will be denied the benefits sought through this action should receive or should have received those benefits in this District.

## PARTIES

10.     Plaintiff Jeffrey Plotnick is a former employee of Computer Sciences

Corporation ("CSC") and a participant in the CSC Deferred Compensation Plan for

Key Executives. He retired in 2012 as Vice-President of Business Development at

CSC. Plaintiff is a fully vested participant in the CSC Deferred Compensation Plan

and the Key Executive Plan.  He currently maintains a residence in Atlantic City,

New Jersey.

11.     Defendant CSC Deferred Compensation Plan for Key Executives

("the CSC Plan") is an "employee benefit plan" within the meaning of ERISA §

3(3) and is an employee pension benefit plan within the meaning of ERISA §

3(2)(A) that was established and is maintained by Defendant Computer Sciences

Corporation.  The preface of the CSC Plan Terms state that the Key Executive Plan

"is a nonqualified deferred compensation plan which is unfunded and is maintained

primarily for the purpose of providing deferred compensation for a select group of

management or highly compensated employees, within the meaning of [ERISA]."

As such, the CSC Plan purports to be what is commonly known as a "top hat" plan.

12.     Defendant Computer Sciences Corporation ("CSC") is a global

information technology services provider and is listed as a Fortune 500 company.

CSC is the sponsor of the CSC Deferred Compensation Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).  CSC is also the Administrator of the CSC Deferred Compensation Plan, within the meaning of ERISA § 3(16)(A), 29 U.S.C. §1002(16)(A) with respect to the Key Executive Plan.  CSC has maintained offices in, New Jersey continuously from at least 1995 to the present.  On its website, http://www.csc.com/management_consulting/ds/11361-locations, CSC identifies one CSC office in West Orange Park, New Jersey.  Upon information and belief, CSC maintains between 3 and 10 offices in other New Jersey locations.

## CLASS ACTION ALLEGATIONS

13.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> Participants in the Key Executive Plan who retired as of December 31, 2012, had elected to receive distributions of deferred income during retirement in installments, and for whom the amount or manner of their benefit payment was altered by the 2013 Amendment; and the Beneficiaries of those Participants.

14.     Excluded from the Class are any employees who had decision-making or administrative authority relating to the establishment, administration, modification, funding, or interpretation of the Plan or the 2013 Amendment.

**Numerosity**

15.     According to the 2012 Schedule 14-A filed by CSC with the Securities and Exchange Commission, there are at least 1,200 active and retired

Participants in the CSC Deferred Compensation Plan. While the term "CSC Deferred Compensation Plan" also includes a Non-Employee Director Plan, which is available only to non-employee members of the CSC Board of Directors, according to CSC's 2013 10-K, the CSC Board of Directors is comprised of only 10 people. As such, the overwhelming majority of the 1200 participants in the CSC Deferred Compensation Plan are participants in the Key Executive Plan. Upon information and belief, the members of the Class likely consist of hundreds of participants.

**Commonality**

16.     The issues of liability are common to all members of the Class as those issues primarily concern whether Defendant CSC may unilaterally amend the terms of the Plan after the participants have retired from employment and whether the Plan is being administered consistent with its terms.

17.     The issues regarding the relief are also common to the members of the Class as the relief will consist primarily of a declaration that the Class is entitled to receive benefits paid in accordance with the terms of the Plan in effect at the time of their retirement, unless they consent to the amended terms of the Plan.

**Typicality**

18.     Plaintiff's claim is typical of the claims of the other members of the Class because their claims arise from the same event, practice and/or course of

conduct. Specifically, Plaintiff, on behalf of himself and all other Class members, challenges Defendants' ability to unilaterally amend the terms of the Plan after his and Class members' retirement and to apply the post-retirement amendment retroactively.

19.     Plaintiff's claim is also typical of the claims of the other members of the Class because the relief sought consists primarily of a declaration establishing their rights under the Plan in effect at the time of their retirement.

20.     Upon information and belief, Defendants do not have any defenses unique to Plaintiff's claim.

**Adequacy**

21.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.

22.      Plaintiff does not have any interests antagonistic to or in conflict with the interests of the Class.

23.     Defendant has no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

24.     Plaintiff has engaged counsel with extensive experience prosecuting class actions in general and ERISA class action litigation experience and expertise.

**Rule 23(b)(1)(B)**

25.     The requirements of Fed. R. Civ. P. 23(b)(1)(B) are satisfied because the primary issues in this case involve a determination about which terms of the Plan apply to the Class and whether the terms of the Plan can be amended unilaterally by Defendant CSC.  In its July 22, 2013 letter to Plaintiff denying his claims, the Plan Administrator recognized that it must interpret and apply the Plan in accordance with its terms consistently to all similarly situated participants. As a result, as a practical matter, resolution of whether the terms of the Plan prior to the 2013 Amendment governs the claims of Plaintiff would be dispositive of the interests of the other participants who retired prior to December 31, 2012.

**Rule 23(b)(1)(A)**

26.     The requirements of Fed. R. Civ. P. 23(b)(1)(A) are also satisfied because the Plan Administrator has a legal obligation to interpret and apply the terms of the Plan consistently for all similarly situated participants.  Section 7.2 of Part A and Section 15.2 of Part B of the Plan Terms require the Plan to "be uniformly and consistently administered, interpreted with regard to all [Part A or Part B] participants in similar circumstances."  As the primary issues in this case involve determination about which terms of the Plan apply to the Class as whole and whether the terms of the Plan can be amended unilaterally by Defendants, conflicting determinations on those issues as to similarly situated participants

creates the risk of establishing incompatible standards of conduct for the administrator of the Plan and/or would require the Administrator to be conflict with the Sections 7.2 and 15.2 of the Plan.

**Rule 23(b)(2)**

27.    The requirements of Fed. R. Civ. P. 23(b)(2) are met in this action because the Plan Administrator's application of the 2013 Amendment has been applied to Plaintiff and all Class members in the same manner.  Additionally, the relief sought by Plaintiff is a declaration of his rights under the terms of the Plan, making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

**Rule 23(b)(3)**

28.    The requirements of Fed. R. Civ. P. 23(b)(3) are met in this action because (a) the questions of law and/or fact, a determination about which terms of the Plan apply to the Class as whole and whether the terms of the Plan can be amended unilaterally by Defendants, are not only common, but will predominate over any individual questions and (b) a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

29.    Because this case involves a determination about which terms of the Plan apply to the Class as whole and whether the terms of the Plan can be amended

unilaterally by Defendants, the individual members of the Class do not have an interest in prosecuting lawsuits separately.

30.     Upon information and belief, there are no other pending lawsuits in which members of the Class have raised similar allegations involving this Plan.

31.     This is an appropriate forum for these claims because, among other reasons, jurisdiction and venue are proper, Plaintiff, and upon information and belief, other members of the Class earned their benefits in this District, and at least a portion of the Class likely resides in this District.

32.     There are no difficulties in managing this case as a class action.

## FACTUAL ALLEGATIONS

33.     CSC established the Computer Sciences Corporation Deferred Compensation Plan (the "CSC Deferred Comp Plan") in August 1995, effective September 30, 1995. One purpose of the CSC Plan is and has been to enable CSC to attract and retain high level employees. As Defendant CSC explained in its 2012 10-K filed with the Securities and Exchange Commission, the markets in which CSC operates "are highly competitive and competition for skilled employees . . . is intense." By allowing employees to defer income until retirement, the CSC Plan not only allows participants to save for retirement, but provides participants with potential tax benefits (or at least deferral of taxes) by receiving their compensation after their retirement.

34.     ERISA § 401(a)(1) exempts "top hat" plans from compliance with the fiduciary provisions of ERISA, including the requirement that the terms of the plan be set forth in an written instrument as required by ERISA § 402(a)(1).  While ERISA does not require a "top hat" plan to have its terms set forth in writing, the sponsor of a "top hat" plan may choose to set forth the terms of a "top hat" plan in a formal plan document.  According to letters "on behalf of the administrator" of the CSC Plan to Plaintiff dated July 22, 2013, August 26, 2013 and September 6, 2013, the terms of the CSC Plan are and have been set forth in writing.

35.     Prior to December 31, 2012, the terms of the CSC Plan were set forth in writing since 2007 in a document entitled the "Amendment and Restatement of the Computer Sciences Corporation Deferred Compensation Plan and Summary Plan Description Effective as of December 3, 2007 ("2007 CSC Plan Terms").  The written terms of the CSC Plan remained unchanged until December 31, 2012 when the terms were amended and set forth in a document entitled the "Computer Sciences Corporation Deferred Compensation Plan and Summary Plan Description Amended and Restated Effective as of December 31, 2012 ( "2012 CSC Plan Terms").  This Complaint refers to both documents collectively as the "CSC Plan Terms."

36. According to the 2007 CSC Plan Terms, the CSC Plan was previously amended and restated effective on February 2, 1998, August 13, 2001, December 9, 2002, August 11, 2003, January 1, 2005 and October 28, 2007.

**The CSC Key Executive Plan**

37. The CSC Plan Terms describe two separate, but essentially identical, plans, one for "Nonemployee Directors" (the "Nonemployee Director Plan") and one for "Key Executives" (the "Key Executive Plan"). The Preface of the CSC Plan Terms defines a "Key Executive" for purposes of the Plan as "any employee of [CSC] who is an officer or other key executive of CSC and who qualifies as a "highly compensated employee or management employee" within the meaning of Title I of ERISA.

38. According to Sections 8.7(a) and 16.7(a) of the CSC Plan Terms, the benefits payable under the Key Executive Plan – i.e. the employees' contributions and the promised earnings thereon – are not held separately from general company assets, and any benefits under the Plan are paid from the general assets of CSC. As such, every dollar in benefits under the Key Executive Plan leaves CSC less money to spend on other purposes.

**The Terms of the CSC Key Executive Plan Prior to January 1, 2013**

39. Effective January 1, 2005, CSC adopted a prospective amendment to the CSC Plan that divided the CSC Plan into a Part A and a Part B. Part A applies

to deferred compensation elected to be taken by Key Executives in taxable years beginning before January 1, 2005, and earnings thereon. Part B applies to deferred compensation elected to be taken by Key Executives in taxable years beginning after December 31, 2004, and earnings thereon.

### *Participant Deferrals*

40.   Pursuant to Sections 3.1(a) and 3.3 of Part A of the CSC Plan Terms and Sections 11.1(a) and 11.2 of Part B of the CSC Plan Terms provided that participants of the Key Executive Plan could make an annual election to defer all or part of his Qualified Bonus or Qualified Salary.

41.   Pursuant to the 3.1(b) of Part A and Sections 11.1(a) and 11.2 of Part B of the Pre-2013 CSC Plan Terms, any election to defer his/her Qualified Bonus or Qualified Salary was "not amendable" by a participant and was "irrevocable" except (a) in the case of a hardship defined in Section 6.1 of Part A and Section 14.1 of Part B, (b) in the event of a change of control defined in Section 6.2 of Part A and Section 13.5 of Part B, (c) with substantial penalty under Section 6.3 of Part A, (d) disability under Section 13.4 of Part B, (e) to pay certain taxes under Section 14.2 of Part B, or (f) if Part B of the Plan failed to meet the requirements of IRC § 409A, pursuant to Section 14.3 of Part B of the Plan.

*Participant Accounts*

42.     Pursuant to Section 4.1 of Part A and Section 12.1 of Part B of the

Pre-2013 CSC Plan Terms, the Administrator was required to credit each

participant's elected deferred compensation to a participant's notional "account."

43.     Pursuant to Section 4.3 of Part A and Section 12.3 of Part B, the 2007

CSC Plan Terms provided that earnings would be credited as follows:

(a)     Beginning on March 29, 2003 and subject to amendment
        by the Board, for each Plan Year earnings shall be
        credited to each Participant's Account, at a rate equal to
        the 120 month rolling average yield to maturity of the
        index call the "Merrill Lynch U.S. Corporates, A Rated,
        15+ Years Index" as of December 31 of the preceding
        Plan Year, compounded annually.

(b)     Beginning on September 30, 1995 and until March 28,
        2003, for each Plan Year earnings shall be credited to
        each Participant's account, at a rate equal to 120% of the
        120-month rolling average yield to maturity on 10-year
        United States Treasury Notes as of December 31 of the
        preceding Plan Year, compounded annually.

(c)     Earnings shall be credited on such valuation dates as the
        Administrator shall determine.

44.     Section 4.5 of Part A and Section 12.5 of Part B, the 2007 CSC Plan

Terms provides that each "Participant's interest in his or her [Part A or Part B]

Account shall be 100% vested and non-forfeitable at all times" (subject to certain

exceptions inapplicable to Plaintiff and the Class).

*Election of Distributions*

45.     Section 5.1(a) of Part A of the 2007 Plan Terms required that
Participants' annual deferral elections to "specify (i) whether payment shall be
made in a lump-sum distribution and/or in approximately equal annual installments
over 5, 10, or 15 years, and (ii) whether payment[s] shall commence on the first,
second, third, fourth or fifth anniversary of the date of such Separation of [sic]
Service, or shall commence within thirty (30) days following the date of such
Separation from Service." Pursuant to Section 5.1(b), the election about the post-
separation timing could be superseded by a subsequent election, so long as it was
made at least 13 months prior to a participant's separation from service.

46.     Section 13.1(a) of Part B of the 2007 Plan Terms required that
Participants' annual deferral elections "specify (i) whether payment shall be made
in a lump-sum distribution and/or in approximately equal annual installments over
1 to 15 years, and (ii) whether payment(s) shall commence on the first, second,
third, fourth or fifth anniversary of the date of such Separation of [sic] Service, or
shall commence within thirty (30) days following the date of such Separation from
Service." Pursuant to Section 13.1(b), the election about the post-separation
timing could be superseded by a subsequent election, so long as it was made at
least 12 months prior to a participant's separation from service, does not become

effective until 12 months after submission and the election provides for deferral of

the date of commencement of distributions for a minimum of five additional years.

### *Receipt of Distributions*

47.     The CSC Plan – specifically Article V of Part A and Article XIII of

Part B of the CSC Plan Terms -- differentiate between distributions made to Key

Executive participants based on retirement (by meeting the definition under the

Plan), based on termination of employment (without retirement) or based on death.

Receipt of Distributions Upon Separation of Service

48.     Pursuant to Section 5.2 of Part A and Section 13.2 of Part B of the

CSC Plan Terms, a Key Executive participant who terminated without meeting the

definition of retirement would receive distribution of his or her account "in a lump

sum distribution within thirty (30) days following the date of [his/her] Separation

from Service" *notwithstanding any election to the contrary made by the* plan

participant.

Receipt of Distributions Upon Retirement

49.     The CSC Plan Terms prior to January 1, 2005, and in Part A of the

CSC Plan Terms after January 1, 2005 defines "Retirement" as "with respect to a

Key Executive, a Separation from Service of such Key Executive (a) on or after

attainment of age sixty-two (62) or (b) prior to attainment of age sixty-two (62) if

the Chief Executive Officer shall designate such Separation from Service as

Retirement for purposes of Part A of the Plan." "Retirement" is defined in Part B of the CSC Plan Terms adopted effective January 1, 2005, as "with respect to a Key Executive, a Separation from Service of such Key Executive on or after attainment of age sixty-two (62)."

50.    For the CSC Plan in effect prior to January 1, 2005, and in Part A of the CSC Plan Terms in effect after January 1, 2005, "Separation from Service" is defined, with respect to a "Key Executive," as "the termination [of the Key Executive's] employment with the Company by reason of resignation, discharge, death or Retirement." "Separation from Service" is defined in Part B of the CSC Plan Terms adopted effective January 1, 2005, as "a 'separation from service' as such term is defined under [Internal Revenue Code] Section 409A."

51.    For those participants who met the definition of retirement, Section 5.1(a) of Part A of the Plan and Section 13.1(a) of Part B of the CSC Plan Terms provided that each Participant's benefit distributions "shall be paid to the Participant as specified" in that Participant's elections.

### *Amendment of the Plan*

52.    No provision of the Plan specifically provided that an amendment adopted after a participant's retirement date could be applied to the retired participant's account.

53.     Section 8.6 and Section 16.6 of the CSC Plan Terms allowed the Plan to be "wholly or partially amended by the Board from time to time, in its sole and absolute discretion, including prospective amendments," but expressly *prohibited* any amendment that would "decrease the amount of any Participant's Account as of the effective date of the Amendment."

**Plaintiff's Employment with CSC & Participation in the Key Executive Plan**

54.     Plaintiff Jeffrey Plotnick began his employment with CSC on November 16, 1984 as Director of Hardware and Image Processing. In 1991, he was promoted to Vice President of Supply Chain Solutions, and was promoted again in 2000 to Vice President of Business Development. Mr. Plotnick was a resident of New Jersey for thirteen years of his employment with CSC and in fact, spent more years in New Jersey while a participant in the Plan than in any other location during his tenure at CSC.  Of the 16 years he was a participant in the Plan, for 13 out of 16 years, the compensation that he deferred was earned in New Jersey.  While the CSC Plan allowed Mr. Plotnick to defer his federal income tax on his compensation, during the 13 years that Plaintiff lived in New Jersey while working for CSC, he paid New Jersey state income tax on the compensation deferred under the terms of the Key Executive Plan.

55.     After nearly twenty-eight years of service at age 62, Mr. Plotnick voluntarily retired from CSC on September 4, 2012.  At time of his retirement the

most recent version of the operative terms of the Key Executive Plan were set forth in the 2007 CSC Plan Terms. At the time that he left employment with CSC, Mr. Plotnick met the definition of "Retirement" under Sections 1.24 and 9.29 of the 2007 CSC Plan Terms. Since retirement, Mr. Plotnick continues to reside part-time in New Jersey and maintains the documents about his benefits under the Key Executive Plan in New Jersey.

56.     According to statements provided by Defendant CSC, Plaintiff began participating in the Key Executive Plan on May 6, 1996. Mr. Plotnick is fully vested under both Parts A and B of the Key Executive Plan, in accordance with Sections 4.5 and 12.5 the Written Terms of the Plan. As of December 31, 2012 (i.e. immediately prior to the 2013 Amendment), Mr. Plotnick's CSC Plan account balance was approximately $ 3.5 million.

### *Plaintiff's Distribution Election*

57.     During his employment at CSC, Plaintiff elected to defer compensation under both Part A and Part B of the Plan. In accordance with the Written Terms of the Plan, Plaintiff specified in his deferral elections the method by which his deferred compensation would be distributed upon retirement.

58.     For fiscal years 2010, 2011, and 2012, Plaintiff elected to have his deferred compensation distributed in 15 approximately equal annual installments, with the first payment made one month after the day of his retirement. For all other

years in which he deferred compensation, Plaintiff elected to receive his

distributions in 15 approximately equal annual installments, with the first payment

to be made on the anniversary of his retirement.

59.    On October 4, 2012, Plaintiff received from CSC an explanation of

the payment schedule for his account in the Plan (the "October 4th Memo") during

his retirement.  Upon information and belief, other members of the Class received

similar payment schedules for the payment of their retirement accounts shortly

after their respective retirements.

60.    The October 4th Memo explained that Plaintiff's annual payment for

the next 15 years was calculated based on the fiscal year 2013 6.30% rate of return

of the Merrill Lynch U.S. Corporates, A Rated, 15+ Years Index (the "Merrill

Lynch Index").  The October 4th Memo also explained that the amount of

Plaintiff's annual payments would be $363,420, excluding the first and last

payments. The last payment could be higher or lower than $363,420 depending on

the actual performance of the Merrill Lynch Index during those 15 years.

**CSC's Revenues and Performance Stagnate**

61.    In December 2011, CSC announced it would write off a $1.5 billion

contract with the United Kingdom's National Health Service.  The write-off

contributed to a $4.2 billion reported loss from continuing operations in fiscal year

2012.  Overall, CSC reported $59 million in free cash flow for fiscal year 2012,

well short of analyst expectations of $500 million for the year. CSC also reported operating losses of $1.2 billion for the year.  Even excluding the loss of the NHS contract, the company's projected margins for the year fell to 10%, compared to 14% historical margins.

62.    In fiscal years 2011 and 2012, the total return on CSC's stock underperformed the S&P 500 and CSC's benchmark sector index by more than 50%.

63.    In December 2011, Standard & Poor's rating service downgraded CSC's debt to BBB+, due, in part, to the NHS contract write-off.  This rating was only three steps above "junk."

64.    CSC suffered further downgrades by Moody's Investors Service, S&P, and Fitch Rating Services in 2012, with all three ratings agencies citing CSC's declining revenues and restricted cash flows as the reason for their ratings changes.

65.    According to a Moody's analysis released in May 2012, CSC's "business and credit profile will likely be challenged until 2014 with flat revenue growth and operating margins only in the mid-single digit range."

66.    Stagnant revenues strained CSC's ability to meet its pension obligations.  As early as May 2009, CSC cancelled benefit accruals to participants

in CSC's Defined Benefit pension plan.  Even after the freeze, CSC was forced to

sell company assets in order to fund its pension obligations.

**The May 2012 Meeting of the CSC Board of Directors**

67.     According to a September 6, 2013 certification by M. Louise Turilli,

Vice President and Secretary of CSC, at a meeting of the Board of Directors of

CSC on May 15, 2012, the Board adopted a resolution amending the CSC Deferred

Compensation Plan.

68.     Pursuant to Sections 4.3 and 8.6 of Part A and Sections 12.3 and 16.6

of Part B of the 2007 CSC Plan Terms, amendments to the Key Executive Plan

could be made only by the CSC Board.

69.     In two letters dated August 6, 2013, Plaintiff requested copies of the

Board resolution and the minutes of the meeting where the Amendment was

adopted.  In response, Eduardo J. Nunez, Vice President of Global Compensation

and Benefits at CSC stated in a September 9, 2013 letter that the "relevant

resolutions" [sic] was the May 15, 2012 Resolution, which provided as follows:

> RESOLVED: that the Board approves amending the Computer
> Sciences Corporation Deferred Compensation Plan, in the manner
> presented to the Board at this meeting, with such changes therein not
> materially at variance with the proposed amendment as so presented
> and as the Vice President and Chief Human Resources Officer shall
> approve with the advice of counsel."

70.     The Board resolution identified by Mr. Nunez did not identify what

was presented to the Board, what amendment it considered or approved, and

whether and to what extent the Amendment varied from the terms of whatever proposal was considered as the subject of the purported resolution. Nothing in the May 2012 Board Resolution identifies the effective date of the Amendment. Nor does anything in the May 2012 Board Resolution suggest that the Board approved making the changes retroactive or applicable to persons who had retired prior to the effective date. In short, the information provided by CSC in response to Plaintiff's request fails to establish whether the 2013 CSC Plan Terms accurately reflect the May 2012 Board Resolution or whether the 2013 Amendment was procedurally valid.

**The December 2012 Notice of the 2013 Amendment**

71.     Plaintiff did not receive any notification of the Board's intent to modify the terms of the Key Executive Plan prior to his retirement. Even though the Board had purportedly already adopted the Amendment to be effective as of January 1, 2013, CSC issued the October 4th Memo to Plaintiff outline his schedule of payments, which would begin *after January 1, 2013*, as if those payments would be made under the terms of the Plan in existence prior to January 1, 2013.

72.     Upon information and belief, notice of the Amendment was not provided to members of the Class until December 2012. Participants in the Key Executive Plan were notified about the Amendment via a 2-page pamphlet mailed

to participants in December 2012 (the "Amendment Notice"). The Amendment Notice stated that, "[e]ffective January 1, 2013, CSC is implementing a number of changes to our Deferred Compensation Plan (DCP)." The Amendment Notice identified four changes to the Plan: (1) Outsourcing the administration of the Plan to an external, third party administrator, Aon Hewitt; (2) Earnings on Plan account balances to be determined in a new manner; (3) Plan installment payments to be calculated in a new manner; and (4) a change in the timing of Plan installment payments.

73.    The first "change" described in the Amendment Notice did not require any changes to the written Plan Terms. Pursuant to Section 1.2 and & 7.4 of the 2007 CSC Plan Terms, CSC, acting through its Chief Executive Officer, was permitted to appoint a delegate as administrator. In fact, there was no substantive change in the 2012 Plan Terms as a result of the administration of the Plan by Aon Hewitt.

74.    The third change described in the Amendment Notice explained that the calculation of installment payments would change as follows: "If you receive installment payments under the [CSC Plan], each future payment will be calculated by dividing your account balance by the number of your remaining payments. *This is different from the level payment stream that was used previously.*" (emphasis added).

**The January 1, 2013 Plan Amendment**

75.     An Amendment to the Plan was made effective on January 1, 2013 (the "2013 Amendment").  Of the four changes identified in the Amendment Notice, the Plan was amended only to implement the second "change."

**Earnings on Account Balances**

76.     The 2013 Amendment modified Sections 4.3(a) and 12.3(a) of CSC Plan Terms in at least three ways:

***Changing of the Notional Investment to Calculate Earnings Rate***

77.     First, as the Amendment Notice described, the 2013 Amendment modified Sections 4.3(a) and 12.3(a) to eliminate the use of the Merrill Lynch Fund to determine the interest crediting rate for participants' account balances. Instead, the 2013 Amendment provided that, effective as of January 1, 2013, CSC Plan participants' account balances would be allocated by between one of four notional "Valuation Funds."  The Four Valuation Funds are (1) a Money Market Fund (2) a Core Bond Fund managed by Blackrock, (3) an S&P 500 Index Fund managed by Mellon Capital and (4) a series of Target Date Retirement Funds managed by State Street.

78.     Between 2003 until 2012, the Merrill Lynch Index provided consistent returns between 2003 and 2012, with the 120-month rolling average resulting in average returns of 6.65% and a standard deviation of .22% between 2007 and

2012.   In contrast, the four new "Valuation Funds" or notional investments under the 2013 Amendment require a participant to choose either low annual returns or greater volatility than the Merrill Lynch Fund.  The following chart compares the returns and volatility of the notional investments between 2003 and 2012:

| Year | Money Market Fund | Core Bond Fund | S&P Index Fund | Target Series Retirement Fund | Merrill Lynch Index | Merrill Lynch Index, 120-Month Rolling Average |
|---|---|---|---|---|---|---|
| 2013 YTD | N/A | N/A | N/A | N/A | 5.01 | 6.12 |
| 2012 | 0.18 | 5.09 | 16.01 | 9.7 | 4.78 | 6.33 |
| 2011 | 0.15 | 7.64 | 2.13 | 4.67 | 5.62 | 6.56 |
| 2010 | 0.21 | 6.7 | 15.12 | 9.64 | 5.95 | 6.78 |
| 2009 | 0.49 | 9.83 | 26.7 | 14.96 | 7.12 | 6.94 |
| 2008 | 2.56 | 0.04 | -36.95 | -13 | 7.35 | 6.88 |
| 2007 | 5.3 | 7.36 | 5.57 | N/A | 6.37 | 6.91 |
| 2006 | 5.02 | 4.16 | 15.8 | N/A | 6.27 | N/A |
| 2005 | 3.32 | 2.47 | 4.93 | N/A | 5.88 | N/A |
| 2004 | 1.17 | 4.34 | 10.9 | N/A | 6.27 | N/A |
| 2003 | 1.11 | 3.97 | 28.73 | N/A | 6.44 | N/A |
| Mean Annual Returns (%) | 1.95 | 5.16 | 8.89 | 5.19 | 6.10 | 6.65 |

| Standard Deviation of Annual Returns (%) | 1.89 | 2.68 | 17.39 | 9.66 | 0.69 | 0.22 |
|---|---|---|---|---|---|---|

79.    With respect to the new "Valuation Funds", Defendant CSC has failed to disclose whether those returns are calculated before or net of fees with respect to the CSC Plan.

### *Potential For Losses*

80.    Before the 2013 Amendment, Sections 4.3(a) and 12.3(a) provided that participant accounts could only gain value based on the earnings of the Merrill Lynch Index as the language provided that "earnings" at a rate equal to the Merrill Lynch Index "shall be *credited to*" participants' accounts, but contained no language permitting participants' accounts to be charged with losses.

81.    The 2013 Amendment modified Sections 4.3(a) and 12.3(a) of the CSC Plan Terms to provide that the "earnings" of these notional investments "shall be credited to *or charged against*" participant accounts "based on a rate equal to the aggregate rate of return on the notional investment options offered under the Plan . . . ." Prior to the 2013 Amendment, the earnings on the notional investment was used only as a credit to each participant's account; a loss to the notional investment would not result in a loss to the participant's account.

-28-

82.     Each of the benchmarks or notional investments added to the Plan by or after the 2013 Amendment can result in losses to a Plan participant's account.

### Allowing the Administrator To Arbitrarily Calculate The Rate of Return

83.     Prior to the 2013 Amendment, the Plan used an objective method to calculate the rate of return credited to participant accounts. As set forth in the 2007 CSC Plan Terms, Sections 4.3(a) and 12.3(a) provided that the rate of return for the notional investment would be calculated according to a constant 120-month rolling average rate.

84.     Under the 2013 Amendment, Sections 4.3(a) and 12.3(a) of the Plan Terms now provide the Plan Administrator with apparently unlimited discretion to calculate the rate of return "for a notional investment option *for any given period* based on the actual return of the corresponding fund" and provide "such calculation shall be conclusive and binding on all interested parties."

**Plaintiff's Exhaustion of Administrative Remedies**

85.     By letter dated May 20, 2013, Plaintiff submitted a "Claim for Benefits under the Computer Sciences Corporation Deferred Compensation Plan" pursuant to §§ 7.11 and 15.11 of the CSC Plan Terms. In his 6-page letter, Plaintiff requested that his CSC Plan account balance be credited in accordance with the terms of the Plan documents in effect as of his retirement date and that he

receive benefit distributions according to the level payment stream provided for in both the pre- and post-Amendment Plan documents.

86.     By letter dated July 22, 2013, Sunita Holzer, Executive Vice President and Chief Human Resources Officer of CSC, on behalf of the Administrator of the CSC Plan, denied Plaintiff's request in a 1-page letter (the "Claim Denial Letter"). The entire rationale set forth in the Claim Denial Letter was as follows:

> As the Plan sponsor, CSC retains the absolute discretion to amend the Plan from time to time pursuant to Sections 8.6 and 16.6 of the Plan document. The amendment in question was authorized by the CSC Board of Directors and timely executed by a duly authorized officer of CSC.
>
> You have requested that your account balance be credited with earnings using the rate in effect under the Plan prior to January 1, 2013. Your request is contrary to the stated terms of the Plan, as set forth in Sections 4.3 and 12.3 of the Plan, and the administrator is obligated to administer the Plan in accordance with its terms.
>
> Therefore your request to recalculate your account using the prior earnings rate must be denied.

87.     The Claim Denial Letter also informed Plaintiff that he had exhausted his administrative remedies under the Plan and was entitled to bring a civil action under ERISA § 502(a), 29 U.S.C. § 1102(a). As a result, Plaintiff has exhausted his administrative remedies under the Plan.

88.     The Claim Denial Letter did not inform Plaintiff that he could seek further review internally or that he had a right to request documents related to the administrative process.

89.     Section 7.11(b) of Part A and Section 15.11(b) of Part B of CSC Plan Terms require that a participant who has made a claim be provided with either a written notice of claim denial or to provide a written notice of an extension within 30 days after receipt of the claim by the Administrator.

90.     Section 7.11(a) of Part A and Section 15.11(a) of Part B of the CSC Plan Terms require, among other things, that the Claim Denial Letter contain "an explanation of the Plan's review procedure and time limits applicable to those procedures."

91.     Section 7.11(f) of Part A and Section 15.11(f) of Part B of the CSC Plan Terms provide that "[i]f the Plan or any of its representatives fail to follow any of the above claims procedures" in Section 7.11, including the requirement to provide an explanation of the claims review procedure in the Claim Denial Letter, "the claimant shall be deemed to have duly exhausted the administrative remedies under the plan and shall be entitled to pursue any available remedies under ERISA Section 502(a), including but not limited to the filing of an action for immediate declaratory relief regarding benefits due under the Plan."

92.     Because the Claim Denial Letter did not meet the requirements of Section 7.11 or Section 15.11 and the Administrator did not following the requirements of the Plan, Plaintiff's claim would be deemed exhausted.

**The Claim Denial Was Not in Good Faith**

93.     Section 7.1(d) and Section 15.1(d) of the Plan required the Administrator to interpret the Plan *only* "in a manner not inconsistent with [Part A or Part B of] the Plan or applicable law . . . ." Defendant CSC's Claim Denial was inconsistent with the terms of the CSC Plan at the time of Plaintiff's retirement and the terms of the Plan after the 2013 Amendment, and it was not a good faith interpretation of the Plan.

94.     In his May 20, 2013 Benefits Claim Letter, Plaintiff explained, in at least three places, that his understanding was that the terms of the Plan in existence at the time of his retirement governed his benefits under the Plan. Defendant CSC's Claim Denial did not address why the terms in existence at the time of his retirement did not govern Plaintiff's benefits under the Plan. Nor did Defendant CSC explain in the Claim Denial why it was relying on a Plan amendment enacted after Plaintiff had terminated employment. Finally, Defendant CSC failed in the Claim Denial to identify any provision of the Plan that authorized an application of an amendment of the Plan to Plan participants who retired before the 2013 Amendment was adopted.

95.     In his Benefits Claim Letter, Plaintiff identified Sections 8.6 and 16.6 of the Plan as prohibiting amendments that "decrease the amount of any [participant's] Account as of the effective date of such amendment." In his Benefits Claim Letter, Plaintiff explained that these provisions were inconsistent with the 2013 Amendment permitting a reduction of the value of the account based on the notional investment. In its Claim Denial Letter, Defendant CSC did not address this inconsistency other than to assert that "[a]s plan sponsor, CSC retains the absolute discretion to amend the Plan from time to time."

96.     In his Benefits Claim Letter, Plaintiff explained that the change of the payment installments to varying amounts was inconsistent with Sections 5.1(a) and 13.1(a) of the Plan (which remained unchanged after the 2013 Amendment). But in its Claim Denial Letter, Defendant CSC did not explain why the unequal payment stream announced in the Amendment Notice was permitted even by the current terms of the Plan.

97.     The failure to explain why Defendant CSC was authorized to amend the terms of the Plan to apply after a participant's retirement, to address that the Plan prohibited enacting or applying an amendment that decreased the value of participants' account or to address new practices with the terms of the Plan demonstrate that the Claim Denial was not in good faith.

-33-

98.     Defendant CSC's failure to inform Plaintiff of any available claims review procedure and failure to provide timely notice of Defendants' claim denial also evidenced Defendant CSC's lack of good faith.

99.     Defendant CSC has, and was at the time of the Claim Denial, had a conflict of interest. Because the Plan is unfunded, benefits paid to Plaintiff and Class members would decrease the amounts available in Defendants' general accounts. Defendants' stagnating revenues, declining margins, and shrinking cash flow constituted a conflict for Defendant CSC in deciding whether Plaintiff's claim for benefits under the Plan as it existed at the time of his retirement.

**CSC Fails to Make Distributions Owed to Plaintiff**

100.    Applying the terms of the Plan in effect as of Plaintiff's retirement, the October 4th Memo notified Plaintiff that he would receive his distribution on September 4, 2013 in the amount of $363,520.

101.    As a result of the changes implemented by the 2013 Amendment, Plaintiff received on or about September 6, 2013 a distribution in the amount of $234,870, over a third less (i.e. $128,650 less) than what he was entitled to receive under the Plan at the time of his retirement.

**COUNT I:**
**CLAIM FOR BENEFITS PURSUANT TO ERISA § 502(A)(1)(B)**
**(ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS)**

102.   Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

103.   ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) authorizes a plan participant to bring a civil action "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

104.   As a purported "top hat" plan, the CSC Plan is a unilateral contract under federal common law whose terms are enforceable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1102(a)(1)(B).

105.   As a unilateral contract, the terms of plan are complete at the time of acceptance by the employee-participant, which is completed by performance.  At the latest, once an employee separates from employment, the terms of a pension plan in existence at the time of separation of employment are the terms that govern the benefits owed to and to be paid to the participant.

106.   Even when a plan reserves to the sponsor an explicit right to amend the plan, acceptance by performance by the employee prevents modification of the terms of the plan.  As a result, the terms of the plan cannot be modified after termination of employment, *unless the plan explicitly provides a **specific** right to*

*amend the plan after termination or retirement.*  No **specific right** *to amend the plan after an employee has terminated or retired* exists in the 2007 CSC Plan Terms.

107.   As the terms of the CSC Plan could not be modified after Plaintiff and the Class terminated employment, Plaintiff and Class members are entitled to have their benefits determined and paid by and consistent with the terms of the Plan in operation no later than the time they terminated or retired.  Among other terms, Plaintiff and the Class are entitled (a) to have earnings credited to their accounts according to the reference asset designated by the Plan document in operation no later than at the time they retired; (b) to have earnings credited to their account on a notional investment without the crediting of losses based that notional investment; (c) to have the rate of return calculated according to the rolling average prescribed  by the Plan document in operation no later than at the time they retired.

108.   Pursuant to terms of the Key Executive Plan in effect as of their termination and in effect today, Plaintiff and the Class are entitled to have their benefits paid in "approximately equal annual installments."

109.   As a result of the 2013 Amendment, Plaintiff and the Class have not received and, as the Plan is presently administered, will not receive benefits to which they are eligible under the Plan paid in an amount and in a manner consistent with the terms of the Plan in existence at the time of their retirement.

**COUNT II:**
**CLAIM FOR EQUITABLE RELIEF PURSUANT TO ERISA § 502(A)(3)**
**FOR APPROPRIATE EQUITABLE RELIEF TO REDRESS VIOLATIONS**
**OF & TO ENFORCE THE TERMS OF THE PLAN**
**(ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS)**

110.   Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

111.   ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

112.   In addition to a declaration of their rights under the terms of the Plan pursuant to ERISA § 502(a)(1)(B), to redress Defendants' violation of the terms of the Plan by applying the 2013 Amendment, Plaintiff and the Class are entitled, pursuant to ERISA §502(a)(3) to a (A) an order requiring disgorgement of any profits earned by Defendants on benefits wrongfully withheld or untimely distributed under the terms of the governing Plan or prejudgment interest, whichever is greater, and (B) an injunction, to the extent not permitted by ERISA § 502(a)(1)(B), requiring Defendants to administer the Plan in effect at the time of their retirement and  preventing Defendants from applying the 2013 Amendment to Plaintiff and the Class with respect to the distribution of their benefits.

**COUNT III:**
**CLAIM FOR EQUITABLE RELIEF PURSUANT TO ERISA § 502(A)(3)**
**FOR VIOLATION OF ERISA § 503 & THE TERMS OF THE PLAN**
**REGARDING THE CLAIMS PROCESS**

113.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs as if set forth fully herein.

114.    ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

115.    ERISA § 503, 29 U.S.C. §1133, requires any "employee benefit plan" to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied," and to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

*Failure To Provide Timely Notice of Denial*

116.    Section 7.11(b) and Section 15.11(b) of the CSC Plan Terms requires the Administrator to provide "written notice of any claim denial pursuant to [Section 7.11(b) or Section 15.11(b)] … not later than thirty (30) days after receipt of the claim by the Administrator," unless special circumstances require an

extension for processing the claim *and* written notice of the extension is given to

the claimant prior to thirty (30) days after receipt of the claim in a manner that

complies with Section 7.11(b)(iii) and Section 15.11(b)(iii) of the CSC Plan

Terms.

117.    Plaintiff submitted his May 20, 2013 6-page claim for benefits

("Benefits Claim Letter") to Defendant CSC as Plan Administrator of the Plan by

certified mail, which was received at the corporate headquarters of CSC on May

22, 2013.

118.    Defendant CSC, as the Plan Administrator, failed to provide either a

notice of the claim denial or written notice of an extension within the 30 days as

required under the Plan.  After the Plan Administrator failed to respond to the

claim in any way, Plaintiff sent another letter to CSC as the Plan Administrator by

certified mail on July 2, 2013.

119.    On July 22, 2013, Defendant CSC finally responded and issued its 1-

page letter denying Plaintiff's Claim.  The July 22, 2013 Claim Denial Letter was

not provided until at least 63 days after Defendant CSC received his claim.

*Failure to Provide Proper Notification of Adverse Benefit Determination*

120.    The Department of Labor Regulations interpreting ERISA § 503, 29

C.F.R. § 2560.503(g)(1), require the administrator of an employee benefit plan to

"provide a claimant with written . . . notification of any adverse benefit

determination." Pursuant to § 2560.503(g)(1)(iv) of the DOL Regulations, the "notification" must "set forth, in a manner calculated to be understood by the claimant . . . [a] description of the plan's review procedures and the time limits applicable to such procedures."

121.   Sections 7.11(a)(iv) and 15.11(a)(iv) of the CSC Plan Terms similarly require the Administrator, if the claim is wholly or partially denied, to provide the claimant with written notice of the denial, setting forth "an explanation of the Plan's review procedures and time limits applicable to those procedures."

122.   The Claim Denial Letter denying Plaintiff's claim for benefits under the Plan constituted an adverse benefit determination within the meaning of ERISA § 503 and 29 C.F.R. § 2560.503(g)(1) & (m)(4).

123.   The Claim Denial Letter contained no description of any review procedure provided by the Plan.

*Failure to Provide Review of Claim Denial*

124.   The Department of Labor Regulations interpreting ERISA § 503, 29 C.F.R. § 2560.503(h)(1), require every employee benefit plan to establish and maintain a procedure by which a claimant shall have an opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan and under which there will be a full and fair review of the claim and the adverse benefit decision.

125.   Sections 7.11(e) and 15.11(e) of the Plan require the Board or its delegate to "take into account all comments, documents, records and other information submitted by the claimant relating to the claim."

126.   Defendants failed to provide Plaintiff with the opportunity to appeal or for a review of the Claim Denial.

127.   To the extent that the July 22, 2013 Claim Denial is considered the equivalent of a written appeal or a final decision under the Plan, Defendants failed to take into account and to address the specific plan provisions including the 2007 Plan Terms and address them in the written notice of decision of the appeal of the Claim Denial.

*Failure to Notify of Right to Receive Documents Relevant to Benefits Claim*

128.   To the extent that July 22, 2013 Claim Denial is considered the equivalent of a written appeal or a final decision under the Plan, Sections 7.11(e) and 15.11(e) of the Plan required the "Board or its delegate" to provide in the denial "a statement that the claimant is entitled to be[sic] receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits."

129.   The Claim Denial did not contain a statement advising Plaintiff that he was entitled to receive, upon request and free of charge, reasonable access to,

and copies of, all documents, records, and other information relevant to the claim for benefits.

*Summary of Violations of the Claims Procedure*

130.   Defendant CSC, as the Plan Administrator, violated ERISA § 503 and 29 C.F.R. § 2560.503(g) and/or the terms of the Plan by failing to provide Plaintiff with (a) a notice of denial within the time required by the Plan, (b) a notice of denial consistent with the DOL Regulations and the terms of the Plan, (c) a procedure for a review of the Claim Denial and/or a proper consideration of the review of the Claim Denial, and (d) notification to Plaintiff of the right to receive documents relevant to the claim for benefits under the terms of the Plan.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   Declaring that Plaintiff and the Class are entitled to receive benefits based on a calculation that is at least equal to the amount due under the terms of the Plan as it existed at the time of their termination;

B.   Requiring Defendants to compute and pay benefits to or on behalf of Plaintiff and the Class according to the terms of the Plan as it existed no later than at the time of their retirement;

C.     Requiring Defendants to re-calculate the benefit amounts due under the terms of the Plan and to pay the difference to or on behalf of Plaintiff and all Class members who receive less in benefits than the amount to which they are entitled;

D.     Requiring Defendants to pay prejudgment interest or disgorge any profits they have earned on benefits wrongfully withheld and/or untimely distributed to Class Members;

E.     Awarding post-judgment interest;

F.     Requiring Defendant to pay attorney's fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1) and ordering the payment of reasonable fees and expenses of this action to Plaintiff's Counsel on the basis of the common benefit and/or common fund doctrine (and/or other applicable law) out of any money or benefit recovered for the Class in this Action;

G.     Awarding, declaring or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper.

Dated:  January 15, 2014

_____
Simon B. Paris
Patrick Howard
Charles J. Kocher
SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA  19103
Telephone:  (215) 496-8282
Facsimile:  (215) 496-0999
E-mail:  sparis@smbb.com
E-mail:  phoward@smbb.com
E-mail:  ckocher@smbb.com

R. Joseph Barton
Matthew A. Smith
COHEN MILSTEIN SELLERS
        & TOLL PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
Email: jbarton@cohenmilstein.com
Email: msmith@cohenmilstein.com

***Attorneys for Plaintiff***