IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| JEFFREY PLOTNICK, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-01002 |
| | ) | |
| COMPUTER SCIENCES | ) | |
| CORPORATION DEFERRED | ) | |
| COMPENSATION PLAN FOR KEY | ) | |
| EXECUTIVES, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiffs in this Employee Retirement Income Security Act ("ERISA")[1] case are former executives for defendant Computer Sciences Corporation and current participants in defendant Computer Sciences Corporation Deferred Compensation Plan for Key Executives ("Plan").[2] The Consolidated Complaint alleges four counts. Counts I, II, and III are alternative theories aimed at obtaining the same relief, namely the invalidation of an amendment to the Plan that plaintiffs allege harms their interests. Count IV alleges a procedural violation of ERISA in that plaintiffs contend they were not afforded a full and fair review of their claims for benefits. With respect to Counts I, II, and III, plaintiffs moved to certify a class action including all similarly situated former employees of CSC whom the challenged amendment affected. CSC opposes class certification and seeks summary judgment on all counts.

Plaintiffs' motion for class certification and CSC's motion for summary judgment have been fully briefed and argued. This Memorandum Opinion disposes of both motions.

---

[1] 29 U.S.C. § 1001 *et seq.*

[2] Both defendants are referred to collectively as "CSC."

## I.[3]

CSC is a Fortune 500 company that provides information technology services worldwide. Since 1995, CSC has sponsored the Plan at issue in this lawsuit. The Plan is what is known as a "top-hat plan," which means it is "unfunded" and "maintained...primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). Pursuant to the Plan, eligible Plan participants—select, highly compensated key executives—can defer each year portions of their base salary and up to 100% of their incentive compensation. Because the Plan is unfunded, deferrals are recorded in notational accounts; no funds are actually segregated or placed in a trust. In other words, an election to defer compensation does not result in CSC's investing money on the participant's behalf. Rather, deferrals are noted for accounting purposes, and participants are paid from CSC's general assets at the appropriate time, which participants can elect to be the time of retirement or as annual installment payments over five, ten, or fifteen years following retirement.[4]

---

[3] Local Rule 56(B) requires a party seeking summary judgment to include in the movant's brief a specifically captioned section listing all material facts as to which the movant contends no genuine dispute exists. Consistent with Local Rule 56(B) and a prior scheduling order entered in this case, a party opposing summary judgment must include his own separately captioned section (i) that corresponds to the movant's section and (ii) that indicates whether each of the movant's asserted facts is admitted or denied, with appropriate citations to the record as necessary. *See Plotnick v. Computer Scis. Corp.*, No. 15-cv-1002 (E.D. Va. Oct. 28, 2015) (Order) (Doc. 76). Plaintiffs, as the parties opposing summary judgment, failed to comply with this requirement. Instead, plaintiffs filed their own list of undisputed facts, which did not respond point-by-point to CSC's asserted facts. As the October 28 Order provides, in this circumstance where there is a failure to comply with Rule 56(B) and the October 28 Order, "[t]he Court may assume that any fact identified by the movant as undisputed...is admitted for the purpose of deciding the motion for summary judgment." *Id.* ¶ 2(e).

[4] CSC represents that for Internal Revenue Code purposes, the Plan is divided into three parts governing different taxable years. Different Plan parts have different requirements for deferral distributions, but these distinctions are immaterial to the instant dispute.

By deferring compensation, Plan participants in essence make a loan to CSC. In return, participants realize certain benefits. For one, deferring income allows participants to defer income taxes, which gives participants the potential to build up more money for retirement or other long-term goals than if they were to invest the same amount after taxes. Additionally, a participant's deferred income grows; deferrals are credited with earnings according to a crediting rate set forth in the Plan. The Plan crediting rate is at the heart of the instant lawsuit.

There have been three crediting rates over the lifetime of the Plan. First, from the Plan's establishment in 1995 through March 2003, the crediting rate was 120% of the 120-month rolling average yield to maturity on 10-year U.S. Treasury Notes as of December 31 of the preceding plan year ("Treasury rate"). Second, as the result of a Plan amendment, in March 2003 the Plan began using as the crediting rate the 120-month rolling average yield to maturity of the Merrill Lynch U.S. Corporate, A Rated, 15+ Years Index ("Merrill Lynch Index"). The Merrill Lynch Index was applied to all deferrals, even those made before the effective date of the new crediting rate. Third, in May 2012 CSC's Board of Directors ("Board") adopted a Plan amendment to the crediting rate to be effective as of January 1, 2013 ("2012 Amendment"). Specifically, the 2012 Amendment replaced the Merrill Lynch Index with four valuation funds as crediting rate options. These four funds mirror the options available in CSC's 401(k) plan. Under the 2012 Amendment, participants can select any mixture of the four valuation funds, and participants can even change their valuation fund selections on a daily basis. The four valuation fund options have varying levels of risk and return. They are (i) a money market fund, (ii) an S&P 500 index fund, (iii) a core bond fund, and (iv) a target-date retirement fund. If a participant fails to select his or her own valuation funds, the money market fund is selected by default.

3

Beyond changing the crediting rate, the 2012 Amendment also changed how annual benefit payments are distributed. Before the 2012 Amendment, participants received equal distribution payments until the final installment, which would be adjusted to reflect the actual performance of the Merrill Lynch Index over the entire distribution schedule. Under the 2012 Amendment, however, distribution installments are determined by applying the crediting rate to the remaining account balance and dividing the total by the number of remaining distribution installments. As a result, distribution payments under the 2012 Amendment are no longer approximately equal over time as they were prior to the 2012 Amendment.

Importantly, the Plan's terms at the time of the 2012 Amendment's adoption gave the Board amendment authority. In general, the Plan provided that it could be "wholly or partially amended by the Board from time to time, in its sole and absolute discretion." *See* D. Mem. Supp., Ex. 4 ("2007 Plan"), §§ 8.6 & 16.6.[5] Moreover, the Plan permitted such amendments to apply prospectively to amounts noted in a participant's account as of the date of amendment. *Id.* The only limitation on CSC's amendment power was that no amendment could decrease the amount of any participant's account "as of the effective date of such amendment." *Id.* In addition to the general amendment power, the Plan also plainly specified that the crediting rate was "subject to amendment by the Board." *Id.* §§ 4.3 & 12.3. Nothing in the Plan distinguished retired employees from active employees for purposes of CSC's amendment power. To the contrary, the Plan defined a "Participant" as any "Key Executive who elects to participate in...the Plan...until [the Key Executive] ha[s] received all benefits due under...the Plan." *Id.* §§ 1.18 & 9.20. In other words, anyone to whom distributions were due under the Plan was a

---

[5] The parallel section citations are the result of the Plan's division into parts; one section applies to Part A and the other to Part B. There is no section citation for Part C because Part C only covers deferrals beginning on January 1, 2013, *i.e.*, the effective date of the 2012 Amendment.

participant for purposes of the Plan, and CSC's amendment authority, by its plain language, permitted amendments to the crediting rate for all participant accounts. *See id.* §§ 4.3 & 12.3, 1.18 & 9.20.

Plaintiffs consider themselves aggrieved by the 2012 Amendment. Plaintiff Jeffrey Plotnick, a former CSC Vice President of Business Development, began participating in the Plan shortly after its establishment in 1995, usually electing to have his account distributed in fifteen annual installments after retirement. At the time Plotnick retired on September 4, 2012, his account balance was approximately $3.5 million dollars; the value did not decline on the effective date of the 2012 Amendment. Plaintiff James Kennedy, also a former CSC Vice President, began participating in the Plan in 1999, typically electing to receive his distributions in installments over ten years after retirement. Kennedy's account balance at the time of his retirement—March 2, 2012—was approximately $4 million, and his account balance was also unaffected as of the effective date of the 2012 Amendment. Given their dates of participation in the Plan, each plaintiff has had his account subject to three different crediting rates—the Treasury rate, the Merrill Lynch Index, and the current regime under the 2012 Amendment. When the 2012 Amendment went into effect, Kennedy elected to allocate his account between the bond fund and the S&P 500 Index. In contrast, Plotnick, in protest to the 2012 Amendment, allowed his account to default into the money market fund.

Plaintiffs began their attack on the 2012 Amendment on May 20, 2013, when their attorneys sent CSC two nearly identical letters, one on behalf of each plaintiff, claiming benefits under the Plan. These letters challenged the 2012 Amendment on four grounds, namely (i) that the Plan is a unilateral contract that cannot be changed after a participant retires, (ii) that the crediting rates under the 2012 Amendment are invalid because the valuation funds have the

potential to lose money, (iii) that the 2012 Amendment improperly allows calculation of the rate

of return for a notational investment option "for any given period" rather than on a 120-month

rolling average, and (iv) that the new manner in which distributions are calculated violates the

Plan's language that participants may elect to receive distributions in approximately equal annual

installments. On behalf of the Plan administrator, CSC Executive Vice President and Chief

Human Resources Officer Sunita Holzer denied plaintiffs' claims for benefits by letters dated

July 22, 2013. These denial letters explained that the Board had the absolute discretion to amend

the Plan under §§ 8.6 and 16.6 and that the Board had exercised that power. The letters further

informed plaintiffs that they had exhausted their administrative remedies under the Plan and had

the right to bring a civil action under ERISA. At the time plaintiffs claimed benefits under the

Plan, they also requested certain Plan documents. CSC's Vice President of Global Compensation

Benefits, Eduardo Nunez, responded to these requests and provided plaintiffs copies of Plan

documents, account statements, distribution election information, and a certified copy of the

relevant Board resolutions amending the Plan.

Plotnick initiated this putative class action in January 2014,[6] and Kennedy intervened in

January 2016. Plaintiffs seek to represent a class consisting of participants (and beneficiaries of

---

[6] Some history is necessary to explain the apparent delay in reaching the class certification and summary judgment issues. This action was initially filed in the United States District Court for the District of New Jersey on January 15, 2014. By Order dated August 7, 2015, the case was transferred to the Eastern District of Virginia. At the agreement of the parties, class certification was set to be argued on March 4, 2016. *See Plotnick v. Computer Scis. Corp.*, No. 15-cv-1002 (E.D. Va. Dec. 30, 2015) (Order) (Doc. 100). This hearing was continued in order to give defendants an opportunity to respond to supplemental evidence that plaintiffs sought to file mere days before the hearing. *See Plotnick v. Computer Scis. Corp.*, No. 15-cv-1002 (E.D. Va. Feb. 29, 2016) (Order) (Doc. 142). Thereafter, the hearing was continued again with the consent of the parties, such that class certification was argued on April 1, 2016, the week before summary judgment arguments. *See Plotnick v. Computer Scis. Corp.*, No. 15-cv-1002 (E.D. Va. Mar. 7, 2016) (Order) (Doc. 154).

participants) in the Plan who retired as of December 31, 2012, who had elected to receive distributions of deferred income during retirement in installments, and for whom the amount or manner of their benefit payment was altered by the 2012 Amendment. The Consolidated Complaint seeks on behalf of this class:

> Count I: recalculation and distribution of benefits under the pre-amendment terms of the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B);
>
> Count II: a declaration that the plan amendment in issue is invalid and an order that benefits be calculated accordingly pursuant to 29 U.S.C. § 1132(a)(3); or
>
> Count III: relief on the basis of equitable estoppel under § 1132(a)(3).

Counts I, II, and III are alleged only in the alternative; plaintiffs concede that relief can only be proper under one of the counts.[7] In addition, in Count IV plaintiffs seek only on their behalf, not the class, a declaration that CSC violated ERISA's "full and fair review" requirement and the Plan's own provisions regarding benefit claims and appeals.

## II.

The first issue to be addressed and resolved is whether class certification is appropriate as to Counts I, II, and III. As noted, plaintiffs propose the following class with regard to each count:

> Participants in the Plan who retired as of December 31, 2012, had elected to receive distributions of deferred income during retirement in installments, and for whom the amount or manner of their benefit payment was altered by the 201[2] Amendment; and the Beneficiaries of those Participants.

The question is whether plaintiffs' proposed class—or any feasible class—meets the requirements of Rule 23, Fed. R. Civ. P.

It is well settled that a class action is an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," and a departure from this

---

[7] *See* Transcript of Hearing on Motion to Dismiss at 21:6-24:10 (Friday, Dec. 4, 2015).

"usual rule" is justified only where the class representatives are part of the class, possess the same interest as the class members, and suffered the same injury as the class members. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal quotations omitted). Thus, in order to certify a class, plaintiffs bear the burden of demonstrating compliance with the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as one of the requirements of Rule 23(b). *See id.* at 2551 ("A party seeking class certification must affirmatively demonstrate...compliance with the Rule" and "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.") (emphasis in original).

CSC argues that plaintiffs' proposed class cannot satisfy Rule 23(a)'s commonality, typicality, and adequacy requirements and that certification is improper under each of Rule 23(b)'s requirements.[8] With respect to the commonality, typicality, and adequacy requirements, it is often observed that these requirements "tend to merge," such that the same basic concerns can be relevant under each of the requirements. *Id.* at 2551 n.5. Moreover, it is well established that the merits of a class certification argument can sometimes "overlap with the merits of the...underlying claim." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).

### A.

The class certification analysis here begins with commonality and typicality. Rule 23(a)(2) requires as a condition of class certification that "there are questions of law or fact

---

[8] There is no dispute that Rule 23(a)'s numerosity requirement is met; the parties agree that the approximately 121 members in the proposed class is sufficient to satisfy Rule 23(a)'s numerosity requirement, *i.e.*, "the class is so numerous that joinder of all members is impracticable." Rule 23(a)(1). *Accord* 7A Wright & Miller, Federal Practice and Procedure: Civil § 1762 at 196 (3rd ed. 2005) (collecting cases for the proposition that classes of thirty-five, forty, fifty, seventy, or one hundred satisfy Rule 23(a)(1)).

common to the class." This requirement is satisfied when there is even a single common question that will resolve an issue central to the validity of each of the class member's claims. *See EQT Prod. Co.*, 764 F.3d at 360. Rule 23(a)(3) imposes a further requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." As one treatise notes, "many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct." Wright & Miller, *supra*, § 1764 at 270 (citing, *inter alia*, *Kennedy v. United Healthcare of Ohio, Inc.*, 206 F.R.D. 191, 196 (S.D. Oh. 2002) (claims that an ERISA health insurance plan violated ERISA by failing to calculate copayments in accordance with the plan arose from the same conduct and were therefore typical)). As noted previously, there is significant overlap between the commonality and typicality requirements. *See Dukes*, 131 S. Ct. at 2551 n.5.

1.

With respect to Counts I and II, the proposed class clearly satisfies the commonality and typicality requirements. The common question under these counts is whether the 2012 Amendment is valid, a question that applies to all Plan participants. Moreover, typicality is satisfied because "the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct," namely the Board's adoption and implementation of the allegedly invalid Plan amendment. *See* Wright & Miller, *supra*, § 1764 at 270.

CSC argues that there is no commonality or typicality as to Counts I and II because causation cannot be demonstrated through class-wide proof. In this respect, CSC relies on *Wiseman v. First Citizens Bank & Trust Co.*, 212 F.R.D. 482, 486-88 (W.D.N.C. 2003), an ERISA breach of fiduciary duty case in which the court concluded that the class lacked

commonality and typicality because ERISA insulates fiduciaries from liability for losses attributable to a participant's exercise of control over his or her account. As the *Wiseman* court noted, although ERISA creates liability for a breach of fiduciary duty, § 1104(c)(1)(B) shields fiduciaries from liability where the losses are attributable to the participant's control of his or her own account. 212 F.R.D. at 486. Thus, *Wiseman* reflects that where a fiduciary breaches his duty to a class of participants, but calculation of damages requires a participant-by-participant analysis as to whether § 1104(c)(1)(B) applies, class certification is inappropriate. *Id.* at 486-88.

CSC points out that under the 2012 Amendment, Plan participants exercise control over their accounts and therefore whether any given participant suffered an injury turns on his or her own valuation fund choices. Yet, CSC's analogy to *Wiseman* fails because the legal issues are entirely different. In *Wisemen*, determining whether the fiduciary incurred liability with respect to any given participant would have required a participant-by-participant analysis as to whether that participant's losses were traceable to the participant's exercise of control over his or her account. Here, in contrast, the common legal question is whether the 2012 Amendment is valid, a question on which Plan participants' post-amendment investment decisions have no bearing. Thus, commonality and typicality are satisfied as to Counts I and II.

## 2.

As to Count III, plaintiffs' estoppel claim, CSC argues that class certification is inappropriate because plaintiffs cannot show that each class member relied, to his or her detriment, on the same material representations. Indeed, many courts have noted that "[b]ecause of their focus on individualized proof, estoppel claims are typically inappropriate for class treatment." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998) (*en banc*) (citing

*Jensen v. SIPCO, Inc.*, 38 F.3d 945, 953 (8th Cir. 1994) (estoppel "must be applied with factual precision and therefore is not a suitable basis for class-wide relief")).

Plaintiffs argue that they can overcome this problem because they and the other putative class members relied on the Plan *as a whole* to their detriment and are therefore entitled to the enforcement of the terms on which they relied. This argument is patently absurd, as the Plan as a whole includes provisions *permitting amendment to the Plan*, including to the crediting rate. Thus, plaintiffs are not really alleging reliance on the terms of the Plan as a whole, but reliance on their own *interpretations* of the Plan.[9] Specifically, plaintiffs argue that they understood the Plan as not permitting amendments adversely affecting the crediting rate. Thus, plaintiffs feel entitled to have the Plan interpreted consistent with their expectations. By the overwhelming weight of judicial authority, however, plaintiffs cannot simply rely on their own interpretations of the Plan; rather, at least seven circuits allow ERISA estoppel claims only where there is a reasonable and detrimental reliance on a *specific* misrepresentation.[10] Moreover, at least three

---

[9] Indeed, the named plaintiffs apparently do not share the same understanding of the Plan. For example, whereas Plotnick believed that CSC could change the crediting rate applied to deferral accounts, Kennedy believed that once a deferral was made the crediting rate for that particular deferral could never be changed. *Compare* Plotnick Dep., 126:8-18 (CSC "could amend the Plan to change the rate of return that would be credited to…deferral account[s] from and after the date of the amendment") *with* Kennedy Dep., 94:7-9 (CSC "could not change the credit of earnings for money that is already put in").

[10] *See, e.g.*, *Guerra-Delgado v. Popular, Inc.*, 774 F.3d 776, 782 (1st Cir. 2014) (under ERISA, estoppel claims are limited to statements that interpret ambiguous plan language, and such claims require (i) a definite misrepresentation of fact with reason to believe reliance will occur and (ii) reasonable reliance to one's detriment); *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444-45 (5th Cir. 2005) ("To establish an ERISA-estoppel claim, the plaintiff must establish: (1) a material misrepresentation; (2) reasonable and detrimental reliance upon the representation; and (3) extraordinary circumstances."); *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 587 (7th Cir. 2000) (under ERISA, estoppel applies where one party makes a misleading representation to

circuits explicitly require a representation constituting an interpretation of ambiguous Plan language on which plaintiffs relied to their detriment in order to state an ERISA estoppel claim. *See Guerra-Delgado*, 774 F.3d at 782; *Greany*, 973 F.2d at 821; *Kane*, 893 F.2d at 1285. Plaintiffs cite no case for the proposition that a plan participant's reliance on an ambiguous term itself, rather than on a misrepresentation as to the term's meaning, gives rise to a claim for estoppel. Thus, to the extent plaintiffs argue that their understanding of the Plan as a whole constitutes an equitably enforceable promise, Count III as alleged simply fails to state a claim.

As the foregoing analysis illustrates, plaintiffs' estoppel claim is viable only if they can show that CSC misrepresented the meaning of ambiguous Plan language and that plaintiffs reasonably relied on that misrepresentation. Not only is it clear that this is not plaintiffs' theory of the case, it is also clear that plaintiffs have adduced no evidence of any such representation by CSC. Thus, class certification is inappropriate with regard to Count III because plaintiffs cannot show that each proposed class member relied on the same specific representation about the Plan. Indeed, as noted previously, the record reflects that plaintiffs are essentially relying on their own interpretations of Plan language—not any representation from CSC officials constituting an

---

another party and the other party has reasonably relied to his detriment on that representation); *Sprague*, 133 F.3d at 403-04 (under ERISA, estoppel claims are only available with respect to ambiguous plan provisions and require (i) a material representation, (ii) known to be false, (iii) intent that another rely on the representation, (iv) unawareness of the truth by the relying party, and (v) reasonable reliance to one's detriment); *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir. 1994) ("[A]n employer can be liable under ERISA…for making affirmative misrepresentations" if a plaintiff can "establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances."); *Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821 (9th Cir. 1992) (two prerequisites to an ERISA estoppel claim are (i) ambiguous plan provisions and (ii) representations constituting an oral interpretation of the plan); *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th Cir. 1990) (same). *But see Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 151 (2d Cir. 1999) (under ERISA, an estoppel claim merely requires (i) a promise, (ii) reliance on the promise, (iii) resulting injury, and (iv) injustice if the promise is not enforced).

interpretation of ambiguous Plan language—which is insufficient to state a claim for relief, let alone permit class certification. Accordingly, because plaintiffs have failed to show that the named plaintiffs' claims are typical of the proposed class in that there is no evidence that each member of the class relied on the same qualifying representations from CSC or even that all class members relied on the same interpretation of the Plan as a whole, the motion to certify a class under Count III must be denied.

**B.**

Analysis now turns to the requirement of adequacy. Rule 23(a)(4) requires as a condition of class certification that "the representative parties will fairly and adequately protect the interests of the class." The adequacy of representation is a question of fact that depends on the circumstances of each case. *See* Wright & Miller, *supra*, § 1765 at 322. Although a number of factors bear on the adequacy of representation, the factor on which CSC seizes is the existence of antagonistic or conflicting interests. Indeed, "[i]t is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented." *Id.* § 1768 at 389.

**1.**

CSC argues that plaintiffs' interests are antagonistic to those of at least some of the proposed class because some of the proposed class members are better off under the 2012 Amendment than under the terms of the pre-amendment Plan. In fact, plaintiffs' and CSC's experts agree that at least some members of the proposed class have benefited financially from the 2012 Amendment. *See* Schwartz Supp. Report, ¶ 8b (identifying at least 17 participants who have suffered no economic harm as of January 29, 2016); Lehn Reply, ¶ 21 ("The number of ultimate beneficiaries could be lower than 17, but also could be as high as 85."). For these

13

participants, the relief sought, *i.e.*, a return to the pre-amendment Plan, could well harm their pecuniary interests. And moreover, the parties' experts again agree that "it is not possible to determine whether a particular participant will receive more or less under the 201[2] Amendment than under the prior plan because of the uncertainty of the performance of the participants' investment choices." Schwartz Supp. Report, ¶ 8b; Lehn Reply, ¶ 21 (quoting Schwartz and expressly agreeing). In other words, not only is it undisputed that *some* participants in the proposed class are better off financially today because of the 2012 Amendment, but it is also undisputed that it is impossible to tell at this stage whether and to what extent the number of such participants might grow.

Plaintiffs contend that CSC's expert analysis is self-serving because it compares actual earnings under the 2012 Amendment to hypothetical earnings under the pre-amendment Plan from October 31, 2012, until October 28, 2015, when the S&P 500 was near its all-time high. As a result, plaintiffs suggest that the number of class members better off under the 2012 Amendment, as represented by CSC, is inflated. Yet, in light of the undisputed and irrefutable fact that market volatility makes it impossible to know how many participants will benefit from the 2012 Amendment, plaintiffs' objection that CSC is relying on a self-serving timeframe fails. Although plaintiffs argue that CSC's measuring period inflates the number of participants who are better off under the 2012 Amendment, market volatility means that participants' account performances can change dramatically (for better or for worse) at any given time. *See* Lehn Reply, ¶ 21 ("[T]he number of participants that ultimately will benefit from the 201[2] Amendment is uncertain and depends upon the performance of each individual's unique investment selections."). In other words, simply because more participants might have been better off on October 28, 2015, than they are today does not change the fact that if the S&P 500

14

were to rally to historic highs tomorrow and to perform strongly well into the future, then even more participants would likely be better off financially under the 2012 Amendment than they were on October 28, 2015, the date used by CSC's expert. Thus, CSC's chosen time frame is not self-serving, but reflective of the reality that market conditions have changed and will continue to change over the Plan's lifetime, and the number of participants who stand to benefit or to suffer financially because of the 2012 Amendment will also fluctuate as a result. In sum, plaintiffs fail to undermine the conclusion that conflicts exist among the putative class members with respect to whether the relief plaintiffs seek here will be a benefit or a harm to these members.

Numerous cases recognize that a divergence of economic interests between the named plaintiff and absent class members—as identified here—can create a conflict that precludes certification under Rule 23(a)(4).[11] For example, in *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003), the Eleventh Circuit vacated a class certification order in an antitrust suit because the injury suffered by some class members was arguably outweighed by the benefits they gained from the absence of generic competition, and thus "the economic interests and objectives of the named representatives differ[ed] significantly from the economic interests and objectives of the unnamed class members." Similarly, in *Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988), the Seventh Circuit considered a denial of class certification where the named representative purported to bring an action against the City of Chicago on behalf of all landowners in the vicinity of an airport. The plaintiff alleged that the defendant harmed the class members by locating an airport in close proximity to their property because the presence of the airport diminished property values. The Seventh Circuit affirmed

---

[11] *See* Wright & Miller, *supra*, § 1768 at 397-402 n.12 (collecting cases in this vein).

denial of certification, noting that "[s]ome of these [class members] undoubtedly derive great benefit from increased operation at [the airport], which make the area attractive for business and may increase the value of land, even as they make land less attractive for residential purposes." *Id.* Yet another example of the inappropriateness of certifying a class where members may have divergent interests is *Phillips v. Klassen*, 502 F.2d 362, 366 (D.C. Cir. 1974). There, the D.C. Circuit affirmed denial of class certification where former postal service employees who had accepted severance packages in exchange for their resignations sought to challenge the legality of their resignations. The D.C. Circuit acknowledged that certain members of the proposed class likely preferred the severance package offer to the possibility of termination as part of a workforce reduction, concluding that "[w]hen as here, there is complaint as to injury…and the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual, the foundations of maintenance of a class action are undermined." *Id.* As in *Valley Drug*, *Bieneman*, and *Phillips*, plaintiffs here seek to certify a class in order to challenge an action that allegedly injures some class members but "may be taken as conferring economic benefits" on other putative class members. *Phillips*, 502 F.2d at 366. In this respect, plaintiffs' interest in invalidating the 2012 Amendment is contrary to the economic interests of those who have benefited from the 2012 Amendment.

Importantly, there is no readily apparent means of constructing a class to ensure that *only* those persons who have suffered economic harm are included in the class. As CSC's expert correctly noted, market volatility means that whether any given participant "ultimately will benefit from the 201[2] Amendment is uncertain and depends upon the performance of [the] individual's unique investment selections" over time. Lehn Reply, ¶ 21. As many courts have recognized, including the Fourth Circuit, an implicit threshold requirement for class certification

is that the class must be ascertainable. *See EQT Prod. Co.*, 764 F.3d at 358. In other words, it must be "administratively feasible…to determine whether a particular individual is a member" of the class. *Id.* (quoting Wright & Miller, *supra*, § 1760). Because market volatility can change whether any given participant comes out ahead or behind under the 2012 Amendment, as compared to how their accounts would have performed under the pre-amendment Plan, a class that seeks to include only those harmed by the 2012 Amendment is not ascertainable because there is no feasible means of predicting how participant accounts will perform in the future. Indeed, any such endeavor is further complicated by the fact that participants can change their valuation fund elections daily. Although one could perhaps evaluate each participant and seek to make a prediction as to (i) which valuation funds he or she is likely to use until the date of his or her last distribution and (ii) how these valuation funds will perform, this would amount to "individualized fact-finding or 'mini-trials,'" the necessity of which render class certification "inappropriate." *Id.* (internal quotations omitted).

Moreover, it would be inappropriate, for example, to pick an arbitrary date (such as the date of judgment) and say that anyone with a current account balance has suffered economic harm if his or her prior actual distributions do not exceed the sum of (i) the amount of the distributions but-for the 2012 Amendment and (ii) the future benefit of receiving the Merrill Lynch Index crediting rate after the date of the judgment.[12] This is so because yet again, as plaintiffs' expert concedes, "it is not possible to determine whether a particular participant will receive more or less under the 201[2] Amendment than under the prior [P]lan because of the uncertainty of the performance of the participants' investment choices and because of the risk that CSC defaults on its obligations." Schwartz Rebuttal, ¶ 8b. Simply put, whether the 2012

---

[12] *See* Schwartz Rebuttal, ¶ 19 (proposing this standard).

Amendment confers an economic benefit or causes an economic harm to a specific Plan participant (i) is speculative today, (ii) was speculative when the experts were drafting their reports, and (iii) will be speculative on the date of judgment. Whether a particular participant wins or loses under the 2012 Amendment will cease to be speculative only when he or she receives his or her final distribution. Only then can his or her actual distributions under the 2012 Amendment be accurately compared to hypothetical distributions under the Merrill Lynch Index.[13]

To recapitulate briefly, the foregoing analysis demonstrates two important points. First, the class as defined by plaintiffs contains class members whose pecuniary interests are in conflict with the goals of the named plaintiffs, which gives rise to an adequacy problem that defeats certification under Rule 23(a)(4). Second, given the specific characteristics of the 2012 Amendment, particularly its use of volatile valuation funds and the ability of participants to change their valuation fund elections on a daily basis, it is impossible to define a class that includes only those persons harmed by the 2012 Amendment because whether any given participant wins or loses under the 2012 Amendment can change on a daily basis. In other words, a class that seeks to include only those harmed by the 2012 Amendment is not ascertainable. Accordingly, class certification is inappropriate under Rule 23(a)(4) as to Counts I, II, and III.

---

[13] The record currently reflects that 44 people have already received all the distributions to which they are entitled, with 36 of those persons having received less than they would have received under the pre-amendment Plan. *See* Transcript of Hearing on Class Certification at 10:7-12 (Friday, April 1, 2016). Even assuming that these 36 individuals are sufficiently numerous to satisfy the requirements of Rule 23(a)(1), these 36 individuals could not constitute a class *in this action* because the named plaintiffs would not be representative of the class. Specifically, because the named plaintiffs have *not* received their full distributions, their claims are not typical of the class. Although the analysis here illustrates that plaintiffs' proposed class is inappropriate for certification, this analysis does not foreclose the possibility that certain participants—such as the 36 individuals referenced here—could mount a class action challenge to the 2012 Amendment.

**2.**

To avoid the conclusion that class certification is inappropriate here, plaintiffs attempt to frame the injury in this case not as pecuniary harm under the 2012 Amendment, but as the loss of a virtually risk-free retirement investment that paid historically above-market rates of return and that was guaranteed to distribute income over the length of the distribution elections, in pre-determined, equal amounts until the last payment. *See* Schwartz Report, ¶¶ 11-16. Yet, plaintiffs cannot demonstrate why a change in crediting rate from the Merrill Lynch Index to a four-option system that empowers participants to make individualized investment choices is necessarily an injury. As CSC correctly points out, some participants might subjectively value the flexibility under the 2012 Amendment for its own sake, and still other participants might prefer the potential under the 2012 Amendment to make investment decisions that outperform the Merrill Lynch Index. In other words, for some putative class members the possibility of a higher reward might justify the acceptance of a higher risk. In this respect, the relief plaintiffs seek—a return to the Merrill Lynch Index crediting rate—"may be taken as conferring [a] benefit[] or working [a] harm, depending on the circumstances of the individual." *Phillips*, 502 F.2d at 366. Accordingly, CSC is correct in arguing that plaintiffs' assumption about a putative class-wide subjective preference for the Merrill Lynch Index is insufficient to justify class certification.

Plaintiffs respond (i) that CSC has not identified a single class member who opposes the relief sought and (ii) that plaintiffs' requested relief is a declaration that CSC cannot change the terms of the Plan without a retiree's consent, so participants who like the 2012 Amendment can simply consent to the 2012 Amendment once relief is awarded. Plaintiff's first argument—that CSC has not identified any participant who opposes plaintiffs' relief—is little more than an attempt to shift the burden such that CSC must *defeat* class certification rather than plaintiffs

19

prove entitlement to it. *See Dukes* at 2551 ("A party seeking class certification must affirmatively demonstrate...compliance with the Rule."). The fact that absent class members are not voicing their dissatisfaction is no more relevant than the fact that other class members are not attempting to intervene and stand shoulder-to-shoulder with plaintiffs. *Cf.* Wright & Miller, *supra*, § 1768 at 431 (before drawing conclusions from "an apparent lack of active interest on the part of the absent class members," the class members should actually be notified and inquiries made).

Plaintiffs' related argument that their requested relief would allow CSC to amend the Plan with a participant's consent similarly fails for at least three reasons. First, plaintiffs assume, without a basis in the record, that if the 2012 Amendment is declared invalid, then CSC will adopt a new amendment that offers the current crediting rate system as an option. Second, plaintiffs assume that their requested relief is the relief that will actually issue. Plaintiffs' legal theory calls for *de novo* review with judicial interpretation of the Plan; if the Plan language does not support the conclusion that CSC can amend with consent or treat participants differently based on consent, then such relief cannot issue. Third, and relatedly, there is good reason to suspect that CSC *cannot* permit certain participants to opt-in to the 2012 Amendment while others are subject to terms of the pre-amendment Plan, as the Plan requires that "[t]he Plan shall be uniformly and consistently administered, interpreted and applied with regard to all...[p]articipants in similar circumstances." *See* D. Mem. Supp. (Doc. 138), Ex. 2 (2012 Plan), §§ 7.2 & 15.2.[14] Thus, there is good reason to doubt that absent class members who support the

---

[14] *See also* Transcript of Hearing on Class Certification at 30:2-4 (Friday, April 1, 2016) ("[I]f...the amendment was invalid, [CSC] would have to treat the people under the Plan the same.") (statement by attorney for CSC).

*status quo* under the 2012 Amendment can consent to the terms of the 2012 Amendment notwithstanding a binding judgment invalidating the 2012 Amendment.

Accordingly, plaintiffs' attempt to articulate the harm as something other than pecuniary loss is insufficient to overcome the class's Rule 23(a)(4) deficiency, as it remains unclear that all putative class members prefer the stability of the Merrill Lynch Index to the personal control available under the 2012 Amendment.

### 3.

Plaintiffs next argue that even if there is a conflict between the interests of the named plaintiffs and the interests of absent class members in plaintiffs' proposed class—as there is— such a conflict is no bar to certification because the absent class members who oppose plaintiffs' requested relief will have their interests represented by CSC. This argument rests on a dubious line of cases holding that so long as all interests are represented by *someone*, Rule 23(a)(4) is satisfied. For example, in *Dierks v. Thompson*, 414 F.2d 453, 456 (1st Cir. 1969), the First Circuit held that a participant in a pension plan who desired aggressive management of the investment fund could not adequately represent all of the participants in the plan, some of whom preferred vested obligations with little or no investment risk. In other words, an intra-class disagreement about which type of investment strategy is superior defeated adequacy. Nevertheless, the *Dierks* court approved of class certification on the surprising ground that the defendant there adequately advanced the preferred position of the absent class members with divergent interests, such that the requirements of due process were satisfied. *Id.* at 457. Similarly, the Fifth Circuit, citing *Dierks*, held in *Horton v. Goose Creek Ind. Sch. Dist.*, 690 F.2d 470, 487 (5th Cir. 1982), that absent class members who opposed the relief sought by the plaintiffs were adequately represented by the defendant.

21

The *Dierks* and *Horton* approach to class certification is far from current and has been criticized as "at odds with both Rule 23 and traditional notions of alignment of parties and interests." *See Littlewolf v. Hodel*, 681 F. Supp. 929, 937 n.4 (D.D.C. 1988) (criticizing *Dierks*). This criticism is well founded. Indeed, *Dierks* focused its analysis exclusively on whether the minimum requirements of due process were satisfied without carefully considering the text of Rule 23. As Rule 23(a) made clear then and makes clear now, the question is not whether the interests of the class are fairly and adequately protected *by someone*, but whether "the *representative parties* will fairly and adequately protect the interests of the class." Rule 23(a)(4), Fed. R. Civ. P. (emphasis added).[15] Moreover, as Rule 23(a) again makes clear, a "representative part[y]" must be a "member[] of [the] class," which precludes allowing CSC's litigating position to suffice. And while parsing the text of Rule 23, it bears emphasizing that the conclusion that plaintiffs, whose interests are at odds with certain members of the class, cannot "fairly...protect the interests of the class" finds firms support in the ordinary sense of what "fair" means. To be "fair" is to be "free from...self-interest,"[16] yet the named plaintiffs are concerned primarily with their own account balances; they are not concerned with the putative class members whose choices under the 2012 Amendment outperformed the Merrill Lynch Index.

Accordingly, it remains the case that as to Counts I, II, and III, there is an actual conflict between the interests of the named plaintiffs and certain class members for whom the 2012 Amendment is an economic benefit, not an economic injury.

---

[15] As with the interpretation of statutes, the interpretation of the Federal Rules of Civil Procedure "assumes that the ordinary meaning of the statutory language accurately expresses the legislative purpose." *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1172 (2013) (interpreting Rule 54(d)(1), Fed. R. Civ. P.) (internal quotations and alterations omitted).

[16] *See* <u>Black's Law Dictionary</u> 535 (5th ed. 1979).

**4.**

In a final attempt to secure class certification, plaintiffs correctly note that certain curative mechanisms exist by which the adequacy deficiency might be remedied. For one, plaintiffs suggest that an alternative class definition may solve the problem. But, as discussed in Part II-B-1, *supra*, there is no clear means of defining the class so as to exclude those who have benefited under the 2012 Amendment because whether someone benefited will not be clear until well after this litigation has concluded. In other words, a class that encompasses only participants who have come out ahead under the 2012 Amendment is not ascertainable at the present time because changes in the market coupled with a participant's ability to change their valuation fund selections may well move people in and out of such a class conceivably on a daily basis.

Alternatively, plaintiffs argue that the class could be certified under Rule 23(b)(3), such that class members who do not want to be associated with the lawsuit can opt out pursuant to Rule 23(c)(2). Certification under Rule 23(b)(3) requires plaintiffs to demonstrate two prerequisites: (i) "that the questions of law or fact common to class members predominate over any questions affecting only individual members" and (ii) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." On this record, plaintiffs cannot show that a class action is superior to other methods of adjudication.

Whether a class action is a superior means of adjudicating a controversy "depends greatly on the circumstances surrounding each case." 7AA Wright & Miller, Federal Practice & Procedure: Civil § 1779 at 156-59 (3d ed. 2005). Indeed, a court must "compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." 7AA Wright & Miller,

Federal Practice & Procedure: Civil § 1779 at 81 (2015 Supp.). Of particular importance in the

instant case are "the class members' interests in individually controlling the prosecution...of

separate actions," a consideration required under Rule 23(b)(3)(A). As the Supreme Court has

noted, the fundamental policy underlying the class action mechanism is "to overcome the

problem that small recoveries do not provide the incentive for any individual to bring a solo

action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)

(quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). Consistent with this

policy and the recognition that class actions are the exception rather than the rule, courts

routinely conclude that the class action is not a superior mechanism where individuals have

sufficient incentives to pursue their own legal redress.[17]

On this record, the members of the proposed class are all highly-compensated and

presumably financially sophisticated former executives for a major multinational corporation. As

the First Circuit has observed, "[t]he origins of the top-hat provision [of ERISA] lie in

Congress's insight that high-echelon employees...are capable of protecting their own pension

interests." *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 43 (1st Cir.

2008). Given plaintiffs' expert's estimates, the $40.8 million in distributions owed as a result of

---

[17] *See, e.g., Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) (observing that "the existence of a negative value suit" is "[t]he most compelling rationale for finding superiority in a class action"); *Bd. of Trustees of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, 287 F.R.D. 216, 229-30 (S.D.N.Y. 2012) ("[I]t would seem that the proposed class members would have a strong interest in individually controlling the prosecution of their own actions because they are sophisticated institutional investors with large claims in the 'millions of dollars.'"); *Kottler v. Deutsche Bank AG*, No. 05-cv-7773, 2010 WL 1221809, at *5 (S.D.N.Y. 2010) (declining to certify a class where the proposed members "are high net-worth investors with large claims, capable of litigating individually"); *Becnel v. KPMG LLP*, 229 F.R.D. 592, 598 (W.D. Ark. 2005) (declining to certify where "the putative class members involved in th[e] case are wealthy investors who are financially able to pursue and manage their own litigation" and "would be seeking significant amounts of damages, making an individual lawsuit most likely a better avenue").

the challenged amendment, divided by the 121 members of the proposed class, indicates that, on average, the sophisticated Plan participants in the proposed class have individual claims in excess of $300,000 apiece.[18] In light of the sophistication and potentially six-figure (or greater) claims of many of the class members, certifying a class in this instance would not further the central goal of the Rule 23(b)(3) mechanism, as the proposed class members have sufficient incentives to enforce their own rights on their own terms.

Moreover, many of the mechanisms designed to protect absent class members in a Rule 23(b)(3) suit are of little use at this point in the litigation. To put this concern in terms of Rule 23(b)(3)(B)'s language, the "extent…of [this] litigation concerning the controversy" reduces the effectiveness of Rule 23(c)'s mechanisms. For example, the right of an absent class member to enter an appearance through an attorney does little to mitigate the prejudice to the absent class members where, as here, the litigation is all but complete and has been driven solely by the interests of the named plaintiffs. And the notice and opportunity to withdraw provisions will only serve to delay resolution of the instant dispute, which has nearly crossed the finish line to judgment.

Accordingly, neither Rule 23(b) nor any other possible curative mechanism suggested is available on this record to overcome the intra-class conflicts that defeat certification under Rule 23(a). Thus, for the foregoing reasons class certification must be denied as to Count III for lack of typicality and as to Counts I, II, and III for lack of adequacy.[19]

---

[18] Although this is a rough estimate rather than a precise and certain figure, the fundamental point is that this is not a situation in which "[t]he *realistic* alternative to a class action is…zero individual suits." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

[19] Given the result reached here, it is worth briefly noting the principal consequences of declining to certify a class. If the plaintiffs were ultimately to prevail in their challenge to the 2012

### III.

Analysis now proceeds to CSC's motion for summary judgment.[20] The dispositive principle that governs this case is simple: Where the terms of a plan authorize the administrator to amend the plan, including specifically by authorizing the administrator to amend the rate at which participants' deferred income accounts are credited with future earnings, the administrator may do so. Yet, plaintiffs raise a number of arguments that seek to complicate what is, at its core, a straightforward case. As the analysis that follows illustrates, these arguments all fail.

### A.

The threshold question on CSC's motion for summary judgment is to determine whether the 2012 Amendment is procedurally valid, *i.e.*, whether CSC properly adopted the 2012 Amendment. A challenge of this sort to the validity of a plan amendment properly arises under § 1132(a)(3), which permits, *inter alia*, "a participant...to enjoin any act or practice which violates

---

Amendment, then the Merrill Lynch Index crediting rate would be restored to all participants, not just the named plaintiffs. *See supra*, n.14. If CSC were ultimately to prevail, then life goes on as before with the 2012 Amendment in full force and effect. Only the named plaintiffs would be bound by such a judgment, but others could choose to sue—perhaps a class of the 36 persons identified *supra*, n.13—and a victory in such a suit—perhaps on an alternative legal theory—would ultimately give plaintiffs precisely what they seek here, namely a return to the Merrill Lynch Index for all participants, including plaintiffs. *See supra*, n.14. Simply put, not certifying a class (i) has little practical effect if plaintiffs prevail and (ii) leaves open the possibility that plaintiffs can be freed from the 2012 Amendment if a different participant or set of participants brings a new case challenging the 2012 Amendment's validity, although the result reached here may influence or discourage the decision to initiate a new lawsuit challenging the 2012 Amendment.

[20] A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party with all reasonable inferences from those facts drawn in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

26

any provision of [ERISA] or the terms of the plan, or...to obtain other appropriate equitable relief." As the Supreme Court made clear in *Cigna Corp. v. Amara*, 563 U.S. 421, 435-36, 438-39 (2011), relief that seeks to *change* the terms of a plan is not relief that seeks "to enforce...rights under the terms of the plan," which is available under § 1132(a)(1)(B). Consistent with *Amara*, many courts rely on § 1132(a)(3) as the statutory source of authority to invalidate a plan amendment and to reform the terms of a plan accordingly. *See Pender v. Bank of Am. Corp.*, 788 F.3d 354, 362-64 (4th Cir. 2015) (concluding that an ERISA § 204(g)(1) challenge to an amendment properly proceeds under § 1132(a)(3)); *Ross v. Rail Car Am. Grp. Disability Income Plan*, 285 F.3d 735, 741 (8th Cir. 2002) ("[C]ounts which seek to invalidate [plan] amendments can only be characterized as arising under 29 U.S.C. § 1132(a)(3)."). As such, any reformation of the Plan must be accomplished through the equitable power authorized under § 1132(a)(3). Once the proper terms of the Plan are settled, however, enforcing those terms in order to obtain benefits thereunder must proceed under § 1132(a)(1)(B).[21] Thus, plaintiffs' threshold challenge to the 2012 Amendment proceeds under § 1132(a)(3), which is asserted in Count II of the Consolidated Complaint.

The thrust of plaintiffs' procedural challenge to the 2012 Amendment is factual. Specifically, plaintiffs contend that there is a dispute as to what amendment terms the Board actually adopted.[22] In this regard, plaintiffs note that at the May 15, 2012 Board meeting at

---

[21] *Accord Schleben v. Carpenters Pension Trust Fund-Detroit & Vicinity*, No. 14-cv-11564, 2014 WL 4604000, at *5 (E.D. Mich. Sept. 15, 2014) (adopting this two-step procedure of reformation under § 1132(a)(3) and an award of benefits under § 1132(a)(1)(B)); *Virtue v. Int'l Brotherhood of Teamsters Retirement & Family Protection Plan*, 886 F. Supp. 2d 32, 35 (D.D.C. 2012) (same).

[22] CSC correctly points out that plaintiffs' argument in this regard fails on procedural grounds. *See* D. Reply (Doc. 178) at 3, n.2. Consistent with the requirements of Local Rule 56(B) and the

which the 2012 Amendment was adopted, no actual draft amendment was presented or considered.[23] Rather, the Board was presented with (i) presentation slides, (ii) draft resolutions, and (iii) meeting minutes from the Board's Compensation Committee, which had already considered the amendment and recommended its adoption. The final Board resolution adopting the 2012 Amendment "approve[d] amending the…Plan, in the manner presented to the Board…, with such changes therein not materially at variance with the proposed amendment as so presented and as the Vice President and Chief Human Resources Officer shall approve with the advice of counsel." D. Mem. Supp., Ex. 13-A ("Minutes") at 3. Plaintiffs argue that there is a dispute of fact with regard to what the Board actually approved because (i) the resolution failed to indicate how the amendment would alter the Plan and (ii) the resolution amounts to an impermissible delegation of amendment authority from the administrator to the Vice President and Chief Human Resources Officer.

To support their argument that the Board's resolution adopting the 2012 Amendment was inadequate, plaintiffs cite a number of cases for the proposition that a Plan amendment must be in writing and clear with respect to the scope of the amendment.[24] These cases are inapposite

---

magistrate judge's October 28 Order, CSC's brief in support of summary judgment contains a list of facts that CSC contends are undisputed. Among these facts, CSC asserts that the Board adopted the 2012 Amendment, the terms of which CSC describes with specificity. *See* D. Mem. Supp. (Doc. 138) at ¶¶ 4, 7-9. Plaintiffs failed to comply with Local Rule 56(B) and the October 28 Order by not responding point-by-point to CSC's asserted undisputed facts. Accordingly, the fact of the adoption of the 2012 Amendment, as described by CSC, is appropriately deemed admitted. *See supra*, n.3. Although this is an independent and sufficient basis on which to dispose of plaintiffs' procedural challenge, plaintiffs' argument is analyzed on its own terms for the sake of completeness.

[23] There is no dispute that Plan amendments required the approval of the Board. *See* 2007 Plan §§ 8.6 & 16.6.

here; they do not concern top-hat plans, which are *sui generis* under ERISA. As the Tenth Circuit observed in holding that "an ambiguous memorandum" could not constitute a plan amendment, the issue of an amendment's validity "is necessarily intertwined with the application of ERISA's fiduciary duty statutes, including…29 U.S.C. § 1102(a)(1) (requiring a plan to be established and maintained pursuant to a written instrument)." *Allison*, 289 F.3d at 1235 n.2. Yet, ERISA's fiduciary duty statutes, including § 1102(a)(1), do not apply to top-hat plans. *See* 29 U.S.C. § 1101(a)(1). Given this, CSC argues that because ERISA does not require top-hat plans to be in writing at all, in CSC's view ERISA does not require top-hat plan amendments to specify clearly and in writing how the plan is altered or what parts of the written plan are to be amended.

Yet, in the end it is unnecessary to address or to consider this argument, as the summary judgment record reflects that the Board clearly considered and approved the terms of the 2012 Amendment. To begin with, the Board's resolution adopting the 2012 Amendment approved amending the Plan "in the manner described in the materials provided to the Board" and "not materially at variance with the proposed amendment." *See* Minutes at 3. There is no dispute that "the materials provided to the Board," as referenced in the resolution, included presentation slides, a cursory review of which is sufficient to establish without a doubt and with adequate clarity the nature of the "proposed amendment." The presentation to the Board outlined two alternatives for reforming the top-hat plan. *See* D. Mem. Supp., Ex. 13-B ("Materials") at 7. One such proposal—labeled the "Recommendation"—was to "[o]ffer [a] subset of 'Funds' from CSC's MAP – Notational accounts that mirror fund performance." *Id.* at 8. The

---

[24] *E.g., Bilheimer v. Fed. Exp. Corp. Long Term Disability Plan*, 605 F. App'x 172, 180 (4th Cir. 2015); *Coffin v. Bowater Inc.*, 501 F.3d 80, 91 (1st Cir. 2007); *Allison v. Bank One-Denver*, 289 F.3d 1223, 1236 (10th Cir. 2002); *Johnson v. Meriter Health Servs. Emp. Retirement Plan*, 29 F. Supp. 3d 1175, 1196-97 (W.D. Wis. 2014); *Tatum v. R.J. Reynolds Tobacco Co.*, No. 02-cv-373, 2011 WL 2160893, at *10 (M.D.N.C. June 1, 2011).

"Recommendation" slide further identified the four funds for this subset, namely a money market fund, an S&P 500 Index fund, a core bond fund, and a retirement fund, *i.e.*, the exact funds CSC now uses. *See id.* And moreover, this same "Recommendation" slide included information on "Participant Demographics," which included "Retirees." *Id.* Importantly, the Board's Compensation Committee reviewed this same presentation the day before, and, acting on the recommendation of CSC's management, recommended that the Board adopt the proposal labeled the "Recommendation." *See* P. Opp. (Doc. 173), Exs. GG (Compensation Committee Minutes) at 4-5; SS (Presentation). In short, the summary judgment record establishes conclusively that the Board was presented with and adopted the 2012 Amendment as currently reflected in the Plan document.

Plaintiffs attempt to muddy the waters by misinterpreting the summary judgment record. First, plaintiffs argue that a "draft version of a new Plan" presented to the Compensation Committee did not include changes to Parts A and B. *See* P. Opp. at ¶¶ 12 (citing P. Ex. QQ). Because Parts A and B of the Plan concern deferrals made before January 1, 2013, the effective date of the 2012 Amendment, plaintiffs argue that the Board did not adopt an amendment that affected retirees. Yet, the summary judgment record does not reflect in any way that the draft plan to which plaintiffs refer was actually presented to the Board when the 2012 Amendment was adopted.[25] In fact, on the face of the draft plan, there is no indication that it was presented to anyone at any time. CSC, however, concedes that the draft plan was presented to the Compensation Committee, but represents that this occurred in March 2012, two months before

---

[25] Indeed, plaintiffs appear to concede that the draft plan on which they rely was *not* presented to the Board at the May 2012 meeting. *See* P. Opp. at ¶ 12 ("The 'materials provided to the Board' were PowerPoint presentations, draft resolutions, and meeting minutes from the Compensation Committee of the Board.").

consideration of the 2012 Amendment.[26] The minutes from the March 2012 Compensation Committee meeting confirm that Plan amendments were considered at the time, and those minutes further confirm that the amendments considered had nothing at all to do with amending the crediting rate. *See* P. Opp., Ex. FF (Compensation Committee Minutes) at 1-2 (approving of changes to "simplify[]" the "overly complex" Plan and to "outsource[e] Plan administration"). Thus, it is unsurprising that the draft plan does not include changes to the crediting rates under Parts A and B of the Plan, as the draft plan was discussed in conjunction with an entirely different set of proposed changes. Simply put, the draft plan to which plaintiffs refer is nothing but a red herring.

Similarly, plaintiffs cite still other "materials presented to the CSC Board in 2012" explaining that proposed changes should "apply only to deferrals of compensation earning in 2013 and beyond." *See* P. Opp. at ¶ 13 (citing P. Ex. II). The materials plaintiffs cite, however, consist of presentation slides from the March 2012 Compensation Committee meeting, which occurred two months before the May 15, 2012 Board meeting at which the Board adopted the 2012 Amendment as proposed by the Compensation Committee a day earlier. As previously discussed, and as confirmed by the presentation slides on which plaintiffs rely, the March 2012 Compensation Committee meeting did not address amending the crediting rate. *See* P. Opp., Ex. II (March 12, 2012 Presentation) at 5-6. Thus, to the extent the March 2012 presentation suggests that proposed changes "must apply only to deferrals of compensation earned in 2013 and

---

[26] To the extent plaintiffs may dispute this representation, any such dispute is without support in the summary judgment record. As the parties opposing summary judgment, the burden is on plaintiffs to produce record material from which a reasonable fact-finder could find in their favor. Plaintiffs have failed to adduce any evidence linking the draft plan to either the Compensation Committee's or Board's May 2012 meetings, or any other meetings at which the crediting rate was discussed. Without such an evidentiary link, no reasonable inference can be drawn that the draft plan constitutes the actual terms of the 2012 Amendment.

beyond," *id.* at 4, this reference is entirely unrelated to the 2012 Amendment. In other words, plaintiffs again rely on materials that have no relationship whatsoever to what the Board was considering when it adopted the 2012 Amendment, nor do plaintiffs even proffer such a relationship. In short, there is no reasonable basis to infer that the March 2012 presentation to the Compensation Committee had anything to do with the 2012 Amendment adopted in May. Accordingly, plaintiffs have failed to adduce record evidence sufficient to create a genuine contested issue of fact.

Finally, plaintiffs' argument that CSC improperly delegated amendment authority to the Vice President and Chief Human Resources Officer—who was authorized to "approve with the advice of counsel" the final language of the amendment "not materially at variance" with what was proposed—likewise fails. *See* Minutes at 3. In short, plaintiffs conflate the concept of amending with the concept of executing an amendment. Moreover, plaintiffs do not show how the language ultimately approved by the Vice President and Chief Human Resources Officer is "materially at variance" with the 2012 Amendment. As discussed previously, the 2012 Amendment as represented by CSC in this litigation and the proposal that the record unambiguously reflects was adopted by the Board are, for all intents and purposes, identical.

Accordingly, the record does not disclose a genuine dispute of material fact as to (i) whether the contents of the 2012 Amendment are different from what CSC represents or (ii) whether CSC improperly delegated amendment authority.

**B.**

Analysis now turns to the substantive validity of the 2012 Amendment. Plaintiffs claimed benefits under the Plan based on their view that the 2012 Amendment is substantively invalid, *i.e.*, that the 2012 Amendment violated the terms of the pre-amendment Plan. CSC denied

plaintiffs' claims for benefits because CSC took a contrary view of the 2012 Amendment's validity. In other words, under CSC's interpretation of the Plan, the 2012 Amendment is substantively valid. Thus, review of CSC's denial of plaintiffs' claims for benefits is, in essence, a review of CSC's interpretation of the Plan as permitting the 2012 Amendment. If CSC correctly interpreted the Plan as permitting the 2012 Amendment, then CSC properly denied plaintiffs' claims for benefits; if CSC's interpretation was in error, then CSC likewise erred in denying plaintiffs' claims for benefits.

Plaintiffs' challenge in this respect proceeds under § 1132(a)(1)(B), which allows a participant to sue "to recover benefits due...under the terms of his plan" and "to enforce his rights under the terms of the plan." This is so because of the nature of plaintiffs' challenge, namely that the 2012 Amendment is invalid because it conflicts with the terms of the pre-amendment Plan. In plaintiffs' view, the Plan constitutes a unilateral contract, the terms of which plaintiffs accepted by performance. Therefore, plaintiffs argue, CSC cannot now amend the terms of the offer post-acceptance. Put differently, because the 2012 Amendment in effect is a change to the terms of the offer, plaintiffs contend that the 2012 Amendment is invalid as inconsistent with the terms of the unilateral contract between plaintiffs and CSC. In this respect, the instant case differs from cases in which plaintiffs challenged plan amendments on *statutory* grounds, thereby bringing their challenges within the proper domain of § 1132(a)(3).[27] Rather, plaintiffs here seek to enforce the terms of their contract with CSC, which is to say they are seeking "to enforce...rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Because

---

[27] *See, e.g., Pender*, 788 F.3d at 362-64 (challenge under ERISA § 204(g)(1)); *Ross*, 285 F.3d at 741 (challenge under ERISA § 402(b)(3)); *Schleben*, 2014 WL 4604000, at *2 (challenge under ERISA § 404(a)(1)(D)); *Virtue*, 886 F. Supp. 2d at 34 (challenge under 29 U.S.C. §§ 1054(g), 1054(h)).

plaintiffs allege § 1132(a)(1)(B) in Count I, their substantive challenge to the 2012 Amendment proceeds under Count I.[28]

1.

The threshold issue in the § 1132(a)(1)(B) analysis is to identify the appropriate standard of review for CSC's decision to deny plaintiffs' claims for benefits based on CSC's determination that the 2012 Amendment is valid. As a general rule, a denial of benefits based on a plan interpretation challenged under § 1132(a)(1)(B) is reviewed *de novo* unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 165 (4th Cir. 2013). If the plan vests the administrator with such discretionary authority, then review of the plan administrator's decision is solely for abuse of that discretion. *See Firestone*, 489 U.S. at 111. This rule derives from the law of trusts, particularly the fiduciary responsibilities incumbent upon administrators with discretionary authority. *See id.* ("Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers."). Top-hat plans, which are exempt from most of ERISA's substantive provisions, present a unique challenge with respect to determining the appropriate standard of review. Specifically, because top-hat plans do not entail fiduciary

---

[28] The undisputed record reflects that CSC's denials of plaintiffs' claims for benefits were not in accordance with the Plan's procedural provisions. Plaintiffs argue that as a result of these procedural deficiencies, they may seek relief under § 1132(a)(3) because Plan §§ 7.11(f) and 15.11(f) provide that CSC's failure to follow claims procedures entitles "the claimant...to pursue any available remedies under ERISA Section 502(a)," which is codified at § 1132(a). In other words, plaintiffs suggest that they can pick their preferred provision of § 1132(a). This argument fails because, as a matter of statutory interpretation, remedies under § 1132(a)(3) are only "available," as the Plan provides, if relief cannot be obtained under the other provisions of § 1132(a). *See Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (ERISA's "structure suggests that [§ 1132(a)(3)] act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132(a)] does not elsewhere adequately remedy.").

34

obligations for plan administrators, courts are split as to whether the logic of *Firestone* applies to top-hat plans.[29]

The Third and Eighth Circuits have held that denials of benefits under top-hat plans should be reviewed *de novo* because top-hat plans are unilateral contracts that should be reviewed in accordance with ordinary principles of contract law. *See Craig v. The Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006); *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 443 (3d Cir. 2001). In contrast, the Seventh and Ninth Circuits apply the ordinary principles of *Firestone* to denials of benefits under top-hat plans. *See Comrie v. IPSCO, Inc.*, 636 F.3d 839, 842 (7th Cir. 2011); *Sznewajs v. U.S. Bancorp Amended & Restates Supp. Benefits Plan*, 572 F.3d 727, 733 (9th Cir. 2009). As the Seventh Circuit explained, "*Firestone* tells us that a contract conferring interpretive discretion must be respected, *even when* the decision is to be made by an ERISA fiduciary;" in the non-fiduciary context (as with top-hat plans), honoring such discretion-conferring clauses is even less controversial. *See Comrie*, 636 F.3d at 842.

Recently, the First Circuit declined to take a position on this split when reviewing a claim for benefits under a top-hat plan that, by its terms, granted the administrator discretion to interpret the plan. *See Niebauer v. Crane & Co., Inc.*, 783 F.3d 914, 923 (1st Cir. 2015). As the

---

[29] Plaintiffs cite *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2d Cir. 2005), for the proposition that certain Department of Labor regulations require *de novo* review here because CSC failed to comply with the Plan's procedures for processing claims for benefits. Contrary to plaintiffs' argument, the applicable regulation provides that "[i]n the case of the failure of a plan to...follow claims procedures..., a claimant shall be deemed to have exhausted the administrative remedies available under the plan." 29 C.F.R. § 2560.503-1(l). This regulation differs from the regulation in place when *Nichols* was decided, and *Nichols* is therefore no longer authoritative on the point for which plaintiffs rely. *Accord Rao v. Life Ins. Co. of N.A.*, 100 F. Supp. 3d 210, 223 (N.D.N.Y. 2015) (calling *Nichols* into doubt because "current ERISA regulations seem to 'take no position on whether a claim is approved or denied upon the expiration of the regulatory time period and, therefore, do not terminate an administrator's authority to exercise its discretion.'").

First Circuit observed, even in circuits that employ *de novo* review of denials of benefits under top-hat plans, courts functionally employ a deferential standard when the plan terms give discretion to the plan administrator. *See id.* This is so because, as the First Circuit noted, under "ordinary contract principles" a grant of discretion to one party is enforceable and need only be exercised in good faith, which means that the discretion must be used reasonably. *See id.* Thus, as the First Circuit persuasively illuminates, as a practical matter when reviewing a denial of benefits under a top-hat plan with a grant of discretion to the administrator, whether the standard of review is *de novo* or deferential is a distinction without a difference. If *Firestone* applies, it calls for deference, and if ordinary contract principles apply, these principles merely call for reasonableness. *See id.*; *Craig*, 458 F.3d at 752 (when the plan vests discretion in the administrator, the ultimate question is whether the benefits decision is "reasonable"); *Goldstein*, 251 F.3d at 444 (same).

In light of the foregoing, it is clear that where, as here, a top-hat plan vests discretion in the plan administrator, courts functionally engage in a deferential review even when these courts are formally conducting *de novo* review. In other words, courts employing a *de novo* standard of review simply ask whether the exercise of discretion was done in good faith, the touchstone of which is reasonableness. *See, e.g., Craig*, 458 F.3d at 752. Similarly, as the Fourth Circuit has noted in applying *Firestone* deference, a discretionary decision will not be disturbed "if it is reasonable." *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000).[30] Importantly, the Plan here vests discretion in the administrator.[31] *See* Plan §§

---

[30] *Accord, e.g., Sznewajs*, 572 F.3d at 734 ("Under the abuse of discretion standard," the question for courts is "whether the plan administrator exercised its discretion reasonably.").

7.1(b), (d) & § 15.1(b), (d) (giving the administrator the power to "determine questions of eligibility" and to "interpret...the Plan and any relevant facts for the purpose of the administration and application of...the Plan"). Accordingly, the parties' dispute concerning whether a denial of benefits under the Plan is governed by unilateral contract principles or is instead subject to *Firestone* deference is immaterial, as the fundamental question presented here is the same regardless: Was the administrator's determination to deny plaintiffs' claims for benefits on the ground that the 2012 Amendment is valid a reasonable interpretation of the Plan?

Given the similarities between reasonableness review and abuse of discretion review, the decision to deny plaintiffs' claims for benefits, which included the ancillary determination that the 2012 Amendment is substantively valid, is properly analyzed under the Fourth Circuit's deferential abuse of discretion framework. In analyzing whether a plan administrator abused his or her discretion (or, in other words, acted unreasonably), the Fourth Circuit considers at least eight factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Helton v. AT&T*, 709 F.3d 343, 353 (4th Cir. 2013) (quoting *Booth*, 201 F.3d at 342-43). These factors—colloquially referred to as the *Booth* factors—cut to the heart of the reasonableness of the administrator's decision and are the proper focus for assessing plaintiffs' challenge to the

---

[31] Whether a plan grants discretion and whether an administrator is acting within the scope of that discretion are threshold questions of law that a court determines *de novo*. *See Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000).

decision to deny benefits under the Plan. *See Booth*, 201 F.3d at 341 (under abuse of discretion review, "a...discretionary decision will not be disturbed if reasonable").

2.

Plaintiffs advance two final arguments in an attempt to avoid abuse of discretion or reasonableness review and to obtain pure *de novo* review instead, both of which fail. First, plaintiffs argue that even if a denial of benefits is reviewed deferentially, the validity of the 2012 Amendment is a question of law that must be reviewed *de novo*. Plaintiffs are correct that many circuits, including the Fourth Circuit, "have recognized that when a fiduciary's interpretation of the plan is based on a legal determination, review is *de novo*." *Hannington v. Sun Life & Health Ins. Co.*, 711 F.3d 226, 231 (1st Cir. 2013) (so holding and collecting cases). Plaintiffs further rely on the Fourth Circuit's decision in *Johannssen v. Dist. No.1-Pac. Coast Dist., MEBA Pension Plan* for the proposition that the validity of a plan amendment is such a legal determination. 292 F.3d 159, 169 (4th Cir. 2002). In *Johannssen*, the Fourth Circuit reviewed *de novo* a plan administrator's decision not to recognize the validity of an amendment to the plan. Although the plan gave the administrator interpretive discretion, the determination of the validity of the amendment required the administrator to determine whether the entity that promulgated the amendment "was the legal successor...as the plan sponsor." *Id.* In other words, the validity of the amendment turned on a legal question about the *status* of the promulgator, a question controlled by law external to the plan document. Consistent with the holdings of other circuits, the "legal questions" that were "appropriate terrain for the court, not plan administrators," in *Johannssen* were legal questions beyond the scope of the plan.[32] Here, the Plan administrator's

---

[32] *See Hannington*, 711 F.3d at 232 (reviewing *de novo* administrator's plan interpretation that "depends wholly upon [the] interpretation of external, non-plan material," namely several federal

38

determination that the 2012 Amendment is valid turns on an interpretation of Plan §§ 8.6 and 16.6, which vest "sole and absolute discretion" with the administrator to amend the plan. That is, whether the 2012 Amendment is valid turns on whether the language of the Plan sweeps broadly enough to encompass changes of the sort enacted, a question that can be resolved using only Plan material. As such, *Johannssen* and related cases are inapposite here.

Second, plaintiffs argue that no discretion was exercised because (i) the claims for benefits were denied by CSC Executive Vice President Sunita Holzer, who is not and has never been the administrator and (ii) the denials were based on an analysis conducted by someone other than the administrator or Holzer, namely attorney Kurt Slawson. This argument is disposable on a straightforward interpretation of the Plan. The Plan defines CSC, acting through its Chief Executive Officer, as the administrator. *See* Plan §§ 1.2 & 9.2. Although the discretion to determine questions of benefits eligibility and to interpret the Plan is vested with the administrator, the Plan expressly permits a delegation of those powers. *See id.* §§ 7.1 & 15.1. And although the Plan creates a formal means of appointing a "delegate," by its plain language this procedure is permitted but not required. *See id.* §§ 7.4 & 15.4 ("The Administrator may, but need not, appoint a delegate."). On this record, it is undisputed that Holzer was acting on behalf of the Plan administrator when she denied plaintiffs' claims for benefits,[33] such that she was therefore exercising the administrator's authority pursuant to §§ 7.1(a) and 15.1(a). Moreover,

---

statutes); *Daft v. Advest, Inc.*, 658 F.3d 583, 594 (6th Cir. 2011) (deferential review "does not apply to a plan administrator's determination of questions of law, such as whether a plan meets the statutory definition of a top-hat plan"); *Riley v. Sun Life & Health Ins. Co.*, 657 F.3d 739, 741-42 (8th Cir. 2011) (deferential review does not apply to administrator's determination of the character and scope of benefits under the Veterans' Benefits Act).

[33] CSC asserts this as an undisputed fact, which is appropriately deemed admitted under Local Rule 56(B) and the October 28 Order. *See* D. Mem. Supp. at ¶ 15; *supra*, n.3.

Holzer's approval of denial letters prepared by attorney Slawson was fully consistent with Plan §§ 7.1(c) and 15.1(c), which permit the administrator—and by extension, persons to whom the administrator's functions are delegated—to "engage...attorneys...to render...advice with regard to any responsibility" and "to rely upon the advice...of any such persons." Thus, Holzer's adoption of the reasoning in the denial letters as prepared by Slawson was fully consistent with her exercise of the administrator's powers under §§ 7.1 and 15.1. As such, deferential review remains appropriate.

Accordingly, review of CSC's denials of plaintiffs' claims for benefits properly proceeds as a review for abuse of discretion (or, in other words, reasonableness) under the *Booth* factors. But as the analysis that follows illustrates, the same result obtains under either the *Booth* factors or a *de novo* standard of review in which reasonableness is not the touchstone of the analysis: CSC correctly interpreted the Plan as permitting the 2012 Amendment, and CSC's denial of plaintiffs' claims for benefits was therefore appropriate.

### 3.

As noted *supra*, the abuse of discretion analysis is governed in the Fourth Circuit by the consideration of the eight non-exclusive factors identified in *Booth*. An application of these factors to CSC's determination that the 2012 Amendment is valid, as expressed in CSC's letters denying plaintiffs' claims for benefits, leaves no doubt that CSC did not abuse its discretion.

Analysis properly begins with the first *Booth* factor, namely the language of the Plan. *See Booth*, 201 F.3d at 342. At the time of the 2012 Amendment, §§ 8.6 and 16.6 of the 2007 Plan granted CSC's Board, "in its sole and absolute discretion," the power to amend the Plan in whole or in part, "including prospective amendments" that would apply to amounts held in participants' accounts as of the effective date. If this were not enough—and make no mistake, it is—the Plan

further provided that the crediting rate (at the time, the Merrill Lynch Index), was "subject to amendment by the Board." *See* 2007 Plan §§ 4.3(a) & 12.3(a). It can hardly be said that CSC abused its discretion by interpreting language permitting amendments to the crediting rate for all participants as permitting amendments to the crediting rate for all participants.

Plaintiffs argue that unilateral contract principles, properly applied here, permit amendments with respect to retirees only if there is *explicit* language permitting such amendments. In support of this position, plaintiffs cite several cases for the proposition that general plan language permitting amendment "at any time" or "from time to time" is insufficient to permit post-retirement amendments to plans under unilateral contract theory.[34] Even assuming that plaintiffs' cited authorities are correct, they are inapposite here; the Plan in issue in this case contains language far more specific than was present in the plans in issue in plaintiffs' cited cases. As noted *supra*, the pre-amendment Plan plainly stated that the crediting rate applied to participant accounts was "subject to amendment by the Board." *See* 2007 Plan §§ 4.3 & 12.3. And moreover, nothing in the Plan distinguished retired employees from active employees for purposes of CSC's amendment power. Rather, the Plan defined a "Participant"—the persons whose accounts were subject to crediting rate amendments—as any "Key Executive who elects to participate in…the Plan…until [the Key Executive] ha[s] received all benefits due under…the Plan." *Id.* §§ 1.18 & 9.20. Thus, anyone to whom distributions were due under the Plan was a participant for purposes of the Plan, and CSC's amendment authority, by its plain language, permitted amendments to the crediting rate for all participant accounts. *See id.* §§ 4.3 & 12.3,

---

[34] *See, e.g., In re New Valley Corp.*, 89 F.3d 143, 151 (3d Cir. 1996) (finding "at any time" language to be ambiguous and construing the language as not permitting post-retirement amendments); *Carr v. First Nationwide Bank*, 816 F. Supp. 1476, 1493-94 (N.D. Cal. 1993) (finding "at any time or from time to time" language to be insufficient).

1.18 & 9.20. Accordingly, the pre-amendment Plan clearly and unambiguously provided for the Board's specific authority to change the crediting rate applicable to participant accounts, regardless whether the participants had already retired.

Even assuming, *arguendo*, that the pre-amendment Plan's language was not unambiguous with respect to post-retirement crediting rate amendment authority, plaintiffs fail to demonstrate why unilateral contract principles would apply here to require the clarity they seek to impose. The primary case on which plaintiffs rely for the proposition that unambiguous language is required is the Third Circuit's decision in *In re New Valley Corp.*, but that case is readily distinguishable. In *New Valley*, an employer terminated benefits under a top-hat plan and applied the termination to retired former employees. 89 F.3d at 145-46. The Third Circuit, invoking unilateral contract principles, held that facially unambiguous plan language permitting amendment by the employer "at any time" was, in fact, ambiguous. *Id.* at 151. This was so, the Third Circuit reasoned, because permitting the amendment language to allow termination of benefits would render the plan, as a unilateral contract, illusory. *Id.* Specifically, the Third Circuit noted that "[a]lthough parties are free to enter into illusory agreements," they are unlikely to do so "when significant benefits are at stake." *Id.* Accordingly, the Third Circuit concluded that context rendered the plan's language authorizing amendment "at any time" ambiguous, and the Third Circuit proceeded—in what it characterized as a "narrow" opinion—to construe the ambiguity in favor of the retirees claiming benefits. *Id.* at 151-152.

*New Valley* is different from the instant case in at least two significant respects. For one, as already discussed the language authorizing amendments in the 2007 Plan was more specific than present in *New Valley*, in that the 2007 Plan expressly authorized amendments to the crediting rate. For another, CSC did not use the 2012 Amendment to *terminate* benefits. Indeed,

the 2007 Plan explicitly restricted CSC from enacting any amendment that would decrease the amount in a participant's account as of the effective date of the amendment. *See* 2007 Plan §§ 8.6 & 16.6. Because CSC lacked the power to terminate benefits altogether, there was no threat that the 2007 Plan was an illusory promise.[35] Without such a threat, there is no basis for treating language that is unambiguous on its face as ambiguous in context, as the Third Circuit did in *New Valley*. *See* 89 F.3d at 151-52.[36] In other words, whereas the Third Circuit in *New Valley* went looking for ambiguity to avoid an illusory contract problem, the absence of an illusory contract problem in this case obviates the need to construe the Plan's general amendment authorization language, which permits the Board to amend the Plan at its discretion, as ambiguous. There is no basis, therefore, to insist—as plaintiffs insist—that the Plan must clearly and specifically permit post-retirement amendments in order for such amendments to be valid. To import such a requirement as a matter of course from the "narrow" *New Valley* opinion would be to impose a rule without a reason. *Id.* at 152.

---

[35] Plaintiffs argue that by this logic, CSC could implement an amendment that terminated or significantly reduced participants' accounts the day *after* the effective date, which would have the same practical effect. That is not this case; under the 2012 Amendment there was no guarantee that *any* participant's account would ever be charged with losses, which is starkly different from plaintiffs' hypothetical amendment that expressly and assuredly reduces the amounts in a participant's account. An amendment of the latter type may well demand a different analysis under the *Booth* factors or unilateral contract principles, assuming such principles properly apply, but the 2012 Amendment affected no such guaranteed losses to plaintiffs' accounts.

[36] The reasoning in *New Valley* was influenced by the Third Circuit's earlier decision in *Kemmerer v. ICI Ams. Inc.*, 70 F.3d 281 (3d Cir. 1995). There, the Third Circuit reasoned that under unilateral contract principles, when a participant leaves the employ of a company, the trustee must determine benefits in accordance with the plan then in effect such that any subsequent unilateral amendments cannot be used to diminish an employee's fully vested rights. *Id.* at 287. Again, *Kemmerer* is distinguishable because under the terms of the Plan here no unilateral amendment by the Board could diminish an account balance as of the amendment's effective date. Thus, CSC does not have the power, nor has it purported to exercise the power, to diminish plaintiffs' fully vested rights by unilateral amendment.

Plaintiffs seek to avoid this outcome and to justify their reliance on *New Valley* and related cases by arguing that they are vested in more than just their account balances. Specifically, plaintiffs argue that the "amount of" a participant's account, which cannot be decreased as of the effective date of an amendment, is ambiguous. *See* 2007 Plan §§ 8.6 & 16.6. Although plaintiffs concede that it would be reasonable to read "amount" to mean "balance" if the Plan were a defined contribution plan, P. Opp. at 22, plaintiffs argue that the Plan is actually a defined benefits plan. And with a defined benefits plan, participants are entitled to a *benefit*, including a crediting rate, not just a balance.

Unfortunately for plaintiffs, the Plan quite clearly *is* a defined contribution plan, insofar as the Plan "provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses" thereon. 29 U.S.C. § 1002(34) (defining a "defined contribution plan").[37] Indeed, the undisputed record reflects that (i) all participants in the Plan have a notational account and (ii) the balance in the account reflects only a participant's contributions and the gains or losses thereon as calculated under the crediting rate. Nevertheless, plaintiffs argue that a top-hat plan must be a defined benefit plan because (i) no money is ever deposited into participant accounts and (ii) there was no risk of investment loss prior to the 2012 Amendment. These "depositing" and "risk of loss" requirements are made from whole cloth; they have no basis in the text of ERISA or in any case law or regulation plaintiffs cite.[38] Because the Plan is not a defined benefit

---

[37] A "defined benefit plan" is any plan that is not a defined contribution plan. *See* 29 U.S.C. § 1002(35).

[38] Plaintiffs misrepresent *Dennison v. MONY Life Retirement Income Sec. Plan for Emps.*, 710 F.3d 741, 742 (7th Cir. 2013), as standing for the proposition that *all* top-hat plans are unfunded

plan, there is no basis to find an abuse of discretion in CSC's interpretation of "amount" as "balance." In fact, CSC's reading is the more natural reading of the term,[39] and CSC would prevail on this point even under a *de novo* review.

Plaintiffs next argue that it is a *per se* abuse of discretion for an administrator to read unambiguous provisions out of a Plan, which is precisely what plaintiffs argue CSC does with respect to Plan §§ 5.1 and 13.1, provisions requiring that distributions be paid in approximately equal installments.[40] Because approximately equal payments are not feasible under the 2012 Amendment due to the volatility of the valuation funds, CSC now interprets §§ 5.1 and 13.1 as requiring that distribution payments be as close to equal as is reasonably administratively feasible. Plaintiffs, citing *Blackshear v. Reliance Life Ins. Co.*, 509 F.3d 634, 639 (4th Cir. 2007), argue that CSC is thereby abusing its discretion by ignoring unambiguous language. This argument fails; when discussing this principle in *Blackshear*, the Fourth Circuit observed that, for example, "if a plan unambiguously provides 20 weeks of compensation as a severance benefit for an employee who has worked for the company for 10 years, the administrator abuses its discretion by reading the plan to provide 17 weeks of compensation." *Id.* No such clarity exists in the Plan here with regard to §§ 5.1 and 13.1. Indeed, it is quizzical that plaintiffs would argue—as they do in this litigation—that context renders ambiguous the Plan's facially unambiguous grant of authority to CSC to amend the crediting rate, yet in the next breath argue

___

defined benefit pension plans, when in fact *Dennison* merely observed that the plan in issue there was an unfunded defined benefit pension plan.

[39] *See* The American Heritage College Dictionary 103 (3d ed. 1993) (in accounting, "balance" is "[t]he difference between [totals in the debit and credit sides of an account]" or "remainder," *i.e.*, the *amount* left over); Black's Law Dictionary 130 (5th ed. 1979) (similar).

[40] CSC represents that the continued inclusion of the approximately equal installment payments provisions was a mere oversight in implementing the 2012 Amendment.

that §§ 5.1 and 13.1, which contain significantly greater ambiguity on their face than the crediting rate amendment provisions, are unambiguous even in spite of context. CSC's interpretation, which harmonizes §§ 5.1 and 13.1 with the realities of the four-fund crediting rate system, "give[s] meaning and effect to every part of the [Plan]." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993). In stark contrast, plaintiffs' reading of the Plan does precisely that for which they attempt to fault CSC, namely read out the unambiguous four-fund crediting rate system as applied to retirees. In other words, CSC's interpretation of §§ 5.1 and 13.1 is superior because it makes the Plan work together as a coherent whole, whereas plaintiffs seek to use §§ 5.1 and 13.1 as tools to cut the four-fund crediting rate system out of the Plan altogether.

As the foregoing analysis of the Plan language demonstrates, not only has CSC not abused its discretion by interpreting the 2012 Amendment as valid, but in fact CSC adopted an interpretation of the Plan that is superior to plaintiffs' interpretation. Specifically, CSC's interpretation of the Plan language (i) gives the ordinary meaning to the unambiguous terms used and (ii) gives effect to every section of the Plan by making the provisions operate together as a cohesive whole. Accordingly, even under a *de novo* standard of review in which the touchstone of the analysis is not merely reasonableness, the Plan language would clearly support CSC's position.

The remaining *Booth* factors do not undermine the conclusion that CSC did not abuse its discretion in interpreting the Plan language. With regard to the second *Booth* factor, plaintiffs argue that CSC's interpretation of the 2012 Amendment as valid is fundamentally at odds with the purposes and goals of the Plan. This is so, plaintiffs argue, because the 2012 Amendment subjects participants to market volatility and risks of loss, whereas the Merrill Lynch Index

provided a steady, above-market rate of return. This argument is frivolous. Even accepting plaintiffs' view that the purpose of the Plan is to allow employees to build wealth and to provide retirement benefits,[41] the 2012 Amendment is not inconsistent with those goals in any way, shape, or form. Participants can build wealth in a volatile market; retirement benefits can accrue in a volatile market. Volatile investment options may not effectuate the goals of the Plan, as identified by plaintiffs, *as well* as the Merrill Lynch Index, but there is nothing about volatility that is *inconsistent* with the goals.

As to the third, fourth, and fifth *Booth* factors, plaintiffs renew their arguments (i) that Holzer did not review anything in denying the claims for benefits, (ii) that CSC's interpretation of the Plan is inconsistent with §§ 5.1 and 13.1, which require payments in approximately equal installments, and (iii) that Holzer lacked the authority to interpret the Plan. As noted in Part III-B-2, *supra*, the suggestion that Holzer lacked the authority to interpret the Plan or to rely on and to adopt the advice of an attorney is plainly contradicted by §§ 7.1 and 15.1 of the Plan. And for the reasons stated with respect to the first *Booth* factor, *supra*, the validity of the 2012 Amendment does not conflict with the Plan's requirement that distributions be paid in approximately equal installments. Apart from these arguments, plaintiffs identify no evidentiary basis to suggest that "the adequacy of the materials considered to make the decision" was insufficient or that "the decision-making process was [un]reasoned and [un]principled." *Booth*, 201 F.3d at 342. Moreover, plaintiffs do not identify any other basis to conclude that "the fiduciary's interpretation was [in]consistent with other provisions in the plan," and the

---

[41] Importantly, the pre-amendment Plan defined its purpose as "providing deferred compensation for a select group of management or highly compensated employees." *See* 2007 Plan at 1. There can be no serious argument that the current Plan, as amended in 2012, does not continue to fulfill that purpose.

undisputed record reflects that, in fact, the previous amendment to the crediting rate was applied to retirees,[42] which demonstrates that CSC's interpretation of the 2012 Amendment as valid with regard to retirees is "consistent…with earlier interpretations of the plan." *Id.* Thus, nothing about the third, fourth, or fifth *Booth* factors undermines the strength of the conclusion that CSC correctly interpreted the Plan, and by extension did not abuse its discretion.

With respect to the seventh *Booth* factor, which looks to relevant external standards, *id.*, plaintiffs argue that the doctrine of *contra proferentem* requires that ambiguous language be construed against the drafting party. In support of this argument, plaintiffs misrepresent the Fourth Circuit's decision in *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256 (4th Cir. 2009), as "confirming" the application of the doctrine. *See* P. Opp. at 27. Yet, *Carden* squarely concluded that the Supreme Court "foreclose[d]" application of *contra proferentem* "to curb the discretion given an administrator by a plan." *Id.* at 260 (citing *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008)). Accordingly, *contra proferentem* cannot be used here to undermine CSC's exercise of discretion.

Plaintiffs further contend that a conflict of interest exists with regard to CSC's denial of plaintiffs' claims in light of the validity of the 2012 Amendment. *See Booth*, 201 F.3d at 343. The crux of plaintiffs' conflict of interest argument is that CSC, which funds the Plan, shifted risk to participants, such that CSC now has fewer liabilities because participant account balances are lower than they would have been but for the 2012 Amendment. This may well be true as a matter of fact today, but it is hardly indicative of a conflict of interest that warrants labelling CSC's interpretation unreasonable. The reality is that shifting the crediting rate to track volatile

---

[42] CSC asserts this as an undisputed fact, which is appropriately deemed admitted under Local Rule 56(B) and the October 28 Order. *See* D. Mem. Supp. at ¶ 4; *supra*, n.3.

indices can either benefit or harm CSC, depending on the performance of the indices. For example, if every Plan participant elected the S&P 500 Index as his or her crediting rate and the S&P 500 thereafter rallied to historic highs such that it surpassed the Merrill Lynch Index, CSC would be worse off financially than under the pre-amendment Plan. Thus, even assuming CSC acted with the intent to shift risks to participants to further CSC's own financial interests, CSC did so in a manner that could backfire and leave CSC in a worse financial position than it was under the pre-amendment Plan. In short, CSC's decision to adopt and to implement the 2012 Amendment was by no means a guarantee that CSC would realize financial benefits as a result. As such, even assuming CSC acted to advance its own interests, because it did not do so in a way that was guaranteed to benefit itself at the expense of participants, this *Booth* factor does not undermine the deference due to CSC's exercise of discretion under the Plan.[43]

The only *Booth* factor that favors plaintiffs is the sixth. As plaintiffs correctly point out, CSC's denial of plaintiffs' claims was not "consistent with the procedural...requirements of ERISA" in that the denial was, *inter alia*, untimely. *Booth*, 201 F.3d at 342. Yet, plaintiffs fail to identify any way in which any procedural irregularity is indicative of an abuse of discretion. Nor have plaintiffs adduced evidence to suggest that they were in any way harmed by the procedural

---

[43] The conflict of interest analysis here is more than charitable to plaintiffs, as the analysis assumes that CSC acted with the intent to advance its own financial interests at the expense of Plan participants. Importantly, plaintiffs offer no record evidence to support such a conclusion. Instead, plaintiffs allege a conflict based merely on the fact that, as a top-hat plan, the Plan is unfunded, and all payments come from CSC's general assets. By this logic, *any* denial of benefits under a top-hat plan would be suspect as an abuse of discretion, an absurd result. But even more damaging to plaintiffs' argument, a fair reading of the summary judgment record here suggests that CSC adopted the 2012 Amendment "notwithstanding increased volatility"—rather than *because of* increased volatility—because the 2012 Amendment was "the most logical and rational approach" to bringing CSC in line with the benefits plans offered by its major peer companies. *See* P. Opp., Ex. GG (Compensation Committee Minutes) at 5.

violations. As such, there is no basis to conclude that this factor should call into question CSC's exercise of discretion in interpreting the Plan to permit the 2012 Amendment.

For the foregoing reasons, CSC cannot be said to have abused its discretion in interpreting the Plan as permitting the adoption and implementation of the 2012 Amendment. To the extent plaintiffs suggest the existence of factual disputes bearing on their arguments as to the *Booth* factors, these disputes are immaterial or unsupported by record evidence;[44] CSC's interpretation of the Plan language is correct even under a *de novo* standard of review. In other words, because CSC's interpretation of the Plan is correct in the abstract, CSC by definition did not abuse its discretion in giving the Plan its ordinary meaning. And in any event, the undisputed summary judgment record further discloses that CSC's interpretation of the Plan (i) was consistent with the goals and purposes of the Plan, (ii) was based on the advice and analysis of an attorney with subject-matter expertise, and (iii) was consistent with past practice with regard to the previous crediting rate amendment, all of which are consistent with a reasonable exercise of interpretive discretion. Because CSC did not abuse its discretion in interpreting the Plan as permitting the 2012 Amendment and denying plaintiffs' claims for benefits accordingly, plaintiffs are not entitled to relief under § 1132(a)(1)(B), and CSC is entitled to summary judgment as to Count I.

## C.

Two issues remain to be addressed on CSC's motion for summary judgment, namely plaintiffs' Counts III and IV. Count III, alleged in the alternative to Counts I and II, is an estoppel claim in which plaintiffs allege that they reasonably relied, to their detriment, on the

---

[44] As noted in Part III-B-2, *supra*, plaintiffs' alleged factual disputes with respect to Holzer's denial of plaintiffs' claims for benefits are, in large part, waived. *See supra*, n.3.

terms of the pre-amendment Plan. Plaintiffs do not allege, nor does the summary judgment record reflect, that any CSC official made specific, oral or written representations interpreting ambiguous terms of the Plan, on which plaintiffs reasonably relied to their detriment. Rather, plaintiffs seek in Count III to hold CSC not to what CSC promised, but to what plaintiffs *believed*—without any basis in any representation from anyone authorized to interpret the Plan— that CSC promised. For the reasons set forth in Part II-A-2, *supra*, this theory of ERISA estoppel liability is not recognized in the law and fails to state a claim.[45] Accordingly, CSC is entitled to summary judgment on Count III, as plaintiffs' estoppel claim fails as a matter of law.

In Count IV, plaintiffs allege that CSC committed various procedural violations of ERISA and the terms of the Plan. CSC does not dispute that these violations occurred, but argues that no substantive remedies exist for the violations. With regard to a remedy, plaintiffs seek a declaration (i) that they have exhausted their administrative remedies and (ii) that they are entitled to pursue claims under any part of § 1132(a), including an entitlement to seek relief under § 1132(a)(3) even if they would otherwise be limited to § 1132(a)(1)(B). *See* Consol. Comp., ¶ 139. In this respect, plaintiffs are, in effect, invoking the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides that "any court of the United States...may declare the rights...of any interested party seeking such declaration, whether or not further relief is or could be sought."

The power to grant a declaration of rights is discretionary, and one of the "principal criteria" guiding this discretion is whether a declaration would serve a useful purpose in clarifying and settling the legal relations in issue. *See Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d

---

[45] *See, e.g., Guerra-Delgado*, 774 F.3d at 782 (under ERISA, estoppel claims are limited to statements that interpret ambiguous plan language, and such claims require (i) a definite misrepresentation of fact with reason to believe reliance will occur and (ii) reasonable reliance to one's detriment).

321, 325 (4th Cir. 1937). Here, the first declaration plaintiffs seek would serve no useful purpose, as CSC does not contend that plaintiffs failed to exhaust their administrative remedies. In other words, there is no dispute that plaintiffs are entitled to sue under ERISA. And as to plaintiffs' second request—a declaration that they are entitled to pursue claims under *any* part of § 1132(a)—plaintiffs request a declaration for a right that plaintiffs do not possess.[46] Accordingly, it is appropriate on this record to decline to exercise declaratory judgment jurisdiction and to grant CSC's motion for summary judgment as to Count IV.

## IV.

For the foregoing reasons, plaintiffs' motion for class certification must be denied, and defendants' motion for summary judgment must be granted.

Alexandria, Virginia
April 26, 2016

/s/

T. S. Ellis, III
United States District Judge

_____

[46] *See supra*, n.28 (noting that, as a matter of statutory interpretation, relief under § 1132(a)(3) is "available" only if relief is unavailable under any other part of § 1132(a)).